**LOCKHEED MARTIN CORPORATION,**
Plaintiff,

v.

**NETWORK SOLUTIONS, INC.,**
and Does 1–20, Defendants.

No. CV 96–7438 DDP (ANX).

United States District Court,
C.D. California.

Nov. 17, 1997.

**950**

David Quinto, Grady L. White, Sandra L. Rierson, Paul S. Chan, Quinn, Emanuel, Urquhart & Oliver, Los Angeles, CA, for Lockheed Martin Corp.

Edward G. Poplawski, Gregory S. Cordrey, Pretty, Schroeder & Poplawski, Los Angeles, CA, Philip L. Sbarbaro, (of Counsel), Hanson and Molloy, Washington, DC, for Network Solutions, Inc.

### Order Granting Defendant's Motion for Summary Judgment

PREGERSON, District Judge.

The motion by defendant Network Solutions, Inc. ("NSI") for summary judgment came before the Court on October 6, 1997. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court grants the motion in its entirety.

### I. Background

The issue presented by this litigation is whether NSI violated federal trademark law by accepting registrations of Internet domain names that are identical or similar to Lockheed Martin Corporation's ("Lockheed") SKUNK WORKS service mark. Lockheed asserts that NSI directly infringed and diluted its mark by accepting the registrations. Lockheed also asserts that NSI is liable as a contributory infringer because NSI did not comply with Lockheed's demands to cancel the registrations.

As to direct infringement, the Court concludes that NSI has not used Lockheed's service mark in connection with the sale, offering for sale, distribution or advertising of goods or services, and therefore cannot be liable for infringement under 15 U.S.C. § 1114(1)(a) or for unfair competition under 15 U.S.C. § 1125(a).

As to dilution, the Court finds that NSI has not made a commercial use of domain names as trademarks, and therefore cannot satisfy the commercial use element of dilution under 15 U.S.C. § 1125(c).

As to contributory infringement, there are two potential bases for liability. First, a defendant is liable if it intentionally induced others to infringe a mark. *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 853–54, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982); *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir.1996). Second, a defendant is liable if it continued to supply a product to others when the defendant knew or had reason to know that the party receiving the product used it to infringe a mark. *Inwood,* 456 U.S. at 853–54, 102 S.Ct. at 2188; *Fonovisa,* 76 F.3d at 264.

Lockheed has not presented evidence that NSI induced others to infringe Lockheed's service mark. Therefore, NSI is not liable under the first basis.

As to the knowledge basis, the Court concludes that NSI's limited role as a registrar of domain names coupled with the inherent uncertainty in defining the scope of intellectual property rights in a trademark militates against finding that NSI knew or had reason to know of potentially infringing uses by others. Furthermore, contributory infringement doctrine does not impose upon NSI an affirmative duty to seek out potentially infringing uses of domain names by registrants.

## A. *The Parties*

For over 50 years, plaintiff Lockheed and its predecessors have operated "Skunk Works," an aerospace development and production facility. Lockheed owns the federally registered "SKUNK WORKS" service mark.

Defendant NSI is a publicly traded corporation with its principal place of business in Herndon, Virginia. Under a contract with the National Science Foundation, NSI is the exclusive registrar of most Internet domain names.

## B. *The Internet*

The Internet is an international "super-network" connecting millions of individual computer networks and computers. The Internet is not a single entity. It is a highly diffuse and complex system over which no entity has authority or control. *See generally American Civil Liberties Union of Georgia v. Reno,* 929 F.Supp. 824, 830–45 (E.D.Pa.1996), *aff'd,* —— U.S. ——, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Although the Internet is now widely known for one of its ways of presenting information—the World Wide Web ("Web")—the Internet supports many other forms of communication. The Internet allows one-to-one communication via electronic mail ("e-mail"). In addition, one person can reach many other users through bulletin board services, newsgroups and numerous other Internet-based means of communication. *Id.* at 834. All of these forms of Internet communication depend on the use of domain names to locate specific computers and networks on the Internet.

For commercial users, the Web is the most important part of the Internet. Unlike previous Internet-based communications formats, the Web is easy to use for people inexperienced with computers. Information on the Web can be presented on "pages" of graphics and text that contain "links" to other pages either within the same set of data files ("Web site") or within data files located on other computer networks. Users access information on the Web using "browser" programs. Browser programs process information from Web sites and display the information using graphics, text, sound and animation. Because of these capabilities, the Web has become a popular medium for advertising and for direct consumer access to goods and services. At the same time, the Web, like the rest of the Internet, is an important medium of non-commercial communications. The Web has made it easier for individuals and small organizations to publish information to the general public. Publication on the Web simply requires placing a formatted file on a host computer.

Web standards are sophisticated and flexible enough that they have grown to meet the publishing needs of many large corpo-

rations, banks, brokerage houses, newspapers and magazines which now publish "online" editions of their material, as well as government agencies, and even courts, which use the Web to disseminate information to the public. At the same time, Web publishing is simple enough that thousands of individual users and small community organizations are using the Web to publish their own personal "home pages," the equivalent of individualized newsletters about that person or organization, which are available to everyone on the Web.

*Id.* at 837. Much of the Web's usefulness derives from its use of links. A link is an image or a short section of text referring to another document on the Web. A user interested in accessing the referenced document selects the link, causing the document to be displayed automatically, along with a new set of links that the user may follow. *Id.* at 836.

While the linked structure of the Web is well-suited to allow users to browse among many sites, following whatever links happen to draw their interest, it is poorly suited for users who want to find a single Web site directly. Users searching for a specific Web site have two options. First, if users know or can deduce the address of a Web site, they can type the address into a browser and connect directly to the Web site as if dialing a telephone number. *Panavision Int'l, L.P. v. Toeppen,* 945 F.Supp. 1296, 1299 (C.D.Cal. 1996). More often, users do not know the exact address and must rely on "search engines" available on the Web to search for key words and phrases associated with the desired Web site. Because of the quantity of information on the Web, searches often yield thousands of possible Web sites. Such a cumbersome process is rarely satisfactory to businesses seeking to use the Web as a marketing tool. Instead, businesses would prefer that customers simply be able to find a Web site directly using a corporate name, trademark or service mark. *Panavision,* 945 F.Supp. at 1299.

### 1. *The Domain Name System*

Web sites, like other information resources on the Internet, are currently addressed using the Internet "domain name system." A numbering system called the "Internet Protocol" gives each individual computer or network a unique numerical address on the Internet. The "Internet Protocol number," also known as an "IP number," consists of four groups of digits separated by periods, such as "192.215.247.50." For the convenience of users, individual resources on the Internet are also given names. Specialized computers known as "domain name servers" maintain tables linking domain names to IP numbers.

Domain names are arranged so that reading from right to left, each part of the name points to a more localized area of the Internet. For example, in the domain name "cacd.uscourts.gov," "gov" is the top-level domain, reserved for all networks associated with the federal government. The "uscourts" part specifies a second-level domain, a set of the networks used by the federal courts. The "cacd" part specifies a subnetwork or computer used by the United States District Court for the Central District of California.

If a user knows or can deduce the domain name associated with a Web site, the user can directly access the Web site by typing the domain name into a Web browser, without having to conduct a time-consuming search. Because most businesses with a presence on the Internet use the ".com" top-level domain, Internet users intuitively try to find businesses by typing in the corporate or trade name as the second-level domain name, as in "acme.com." Second-level domain names, the name just to the left of ".com," must be exclusive. Therefore, although two companies can have nonexclusive trademark rights in a name, only one company can have a second-level domain name that corresponds to its trademark.[1] For example, Juno Lighting, a maker of lamps, sought to establish a

---

**1.** One solution to this problem is for businesses to stake their claims on higher level domain names. For example, a business could use an Internet service provider's second-level domain and place its trademark in the third-level domain. Thus, if Acme Plumbing uses the Micro- soft Network, its Web site could be at "acme. msn.com.," Acme Electrical could house its Web site on America Online with the address "acme. aol.com." The drawback of this solution is that it requires customers to guess as to the second-level domain.

Web site with the address "juno.com," a domain name already in use by Juno Online Services, which uses the domain name as part of e-mail addresses for hundreds of thousands of e-mail customers. *See Juno Online Servs., L.P. v. Juno Lighting, Inc.,* 979 F.Supp. 684 (N.D.Ill.1997). In short, the exclusive quality of second-level domain names has set trademark owners against each other in the struggle to establish a commercial presence on the Internet, and has set businesses against domain name holders who seek to continue the traditional use of the Internet as a non-commercial medium of communication.

### 2. NSI's Role in the Domain Naming System

Under a contract with the National Science Foundation, NSI manages domain name registrations for the ".com," ".net," ".org," ".edu," and ".gov" top-level domains. The contract authorizes NSI to charge $100 for an initial two-year registration and $50 annually starting the third year. NSI registers approximately 100,000 Internet domain names per month. (Graves Decl. ¶ 5.) Registration applications are made via e-mail and in more than 90% of registrations no human intervention takes place. (Graves Depo. at 54.) On average, a new registration occurs approximately once every 20 seconds. (*Id.* at 47–48.)

NSI performs two functions in the domain name system. First, it screens domain name applications against its registry to prevent repeated registrations of the same name. Second, it maintains a directory linking domain names with the IP numbers of domain name servers. The domain name servers, which are outside of NSI's control, connect domain names with Internet resources such as Web sites and e-mail systems.

NSI does not make an independent determination of an applicant's right to use a domain name. Nor does NSI assign domain names; users may choose any available second-level domain name. In 1995, NSI responded to the problem of conflicting claims to domain names by instituting a domain name dispute policy. Under the current policy, in effect since September 9, 1996, NSI requires applicants to represent and warrant that their use of a particular domain name does not interfere with the intellectual property rights of third parties. (Graves Decl. Ex. 1.) Under the policy, if a trademark holder presents NSI with a United States Patent and Trademark Office registration of a trademark identical to a currently registered domain name, NSI will require the domain name holder to prove that it has a pre-existing right to use the name. If the domain name holder fails to do so, NSI will cancel the registration. (*Id.*) NSI's policy has been criticized as favoring trademark owners over domain name holders, and favoring owners of federally registered marks over owners of non-registered marks, because owners of federally registered marks can invoke NSI's policy to effectively enjoin the use of identical domain name's without having to make any showing of infringement or dilution. 2 Jerome Gilson & Jeffrey M. Samuels, *Trademark Protection and Practice,* §§ 5.11[4][B], at 5–239, 5.11[5], at 5–243 (1997) (noting that NSI's policy is tilted in favor of trademark owners, who can deprive registrants of domain names without meeting the likelihood of confusion test for infringement or showing that the domain name dilutes the mark); Gayle Weiswasser, *Domain Names, the Internet, and Trademarks: Infringement in Cyberspace,* 13 Santa Clara Computer & High Tech. L.J. 137, 172–73 (1997).

If a trademark holder and domain name registrant take their dispute to court, NSI will deposit the domain name in the registry of the court. This process maintains the status quo; the domain name remains active while in the registry of the court.[2]

---

**2.** Although NSI's policy does not refer explicitly to interpleader actions, NSI has attempted to deposit domain names in the registry of the court by bringing interpleader actions. None of the actions have been successful. (Graves Depo. at 104–05.) In the one reported case arising from this interpleader policy, the district court dismissed NSI's interpleader action. *Network Solutions, Inc. v. Clue Computing, Inc.,* 946 F.Supp. 858 (D.Colo.1996). Clue Computing had sued NSI in state court to prevent cancellation of its domain name registration, "clue.com," at the behest of Hasbro, Inc., which sought to use the domain name for a Web site based on the board

### C. *Factual Background*

Most of the underlying facts of this case are not in dispute. The dispute at summary judgment is over the interpretation of the law and the application of the law to the facts. The Court finds that there is no genuine issue as to the following facts:

1. Lockheed owns the federally registered SKUNK WORKS service mark for "engineering, technical consulting, and advisory services with respect to designing, building, equipping, and testing commercial and military aircraft and related equipment." (Land Decl. Exs. A & B (Certificate of Registration Nos. 968,861 & 1,161,482).)

2. In August 1994, Seng–Poh Lee registered the domain name "skunkworks.com" with NSI. Lee did not associate the domain name with a Web site. In March 1996, Lockheed demanded that Lee cancel his registration. In May 1996, Lee complied. However, Lockheed did not apply to NSI for registration of the name. It became generally available and was registered by Grant Smith, a resident of the United Kingdom, in December 1996. (Graves Decl. ¶ 14; Quinto Decl. Ex. H.)

3. In September 1995, Kathy Huber, a resident of New York, registered "skunkwrks.com" with NSI for the use of her employer Skunkworks Marketing Lab, Inc ("SML"). SML used the domain name for e-mail only; it did not associate a Web site with the domain name. (Jones Decl. Ex. 4.) On March 21, 1996, Lockheed sent a cease-and-desist letter to SML. (Heeg Decl. Ex. C.) SML filed a petition in the United States Patent and Trademark Office seeking to cancel registration of the SKUNK WORKS mark on the grounds that "skunk works" was generic. SML has since moved to withdraw its petition. (Quinto Decl. ¶¶ 9–11.)

4. In January 1996, Ken Hoang, a resident of California, registered the domain name "skunkwerks.com" with NSI for use by his company Skunk Works Multimedia, Inc. Lockheed sued Hoang's company for trade-mark infringement in May 1996. *Lockheed Martin Corp. v. Clayton Jacobs,* CV 96–3422 (C.D. Cal. filed May 13, 1996). On July 23, 1996, that action resulted in a consent judgment under which the parties agreed that the domain name would be assigned to Lockheed. (Jones Decl. Ex. 7.) Lockheed claims that it provided NSI with a file-stamped copy of the consent judgement and requested that NSI transfer the infringing domain name registrations to Lockheed, but NSI took no action. (Quinto Decl. ¶¶ 6, 7.) NSI, however, asserts that Lockheed has failed to complete the necessary form to effect the transfer, despite offers of assistance by NSI's counsel. (Heeg Decl. ¶ 2, Ex. A.).

5. In January 1996, Roger Barski, an Illinois resident, registered the domain name "skunkwerks.com" with NSI. Barski used the domain name in association with a Web site offering his services as a Web site designer. (Jones Decl. Ex. 5.) After receiving a cease-and-desist letter from Lockheed, Barski canceled his "skunkwerks.com" account with his Internet service provider, essentially deactivating the domain name. He did not, however, request to have the name removed from NSI's registry.

6. On May 7, 1996, Lockheed sent NSI a letter advising NSI that Lockheed owned the SKUNK WORKS mark and requesting that NSI cease registering domain names that referred to or included the names "skunk works" or "skunkworks" or otherwise infringed Lockheed's mark. (Quinto Deal. Ex. A.) Lockheed also requested that NSI provide Lockheed with a list of registered domain names that contain the words "skunk works" or any variation thereof. Lockheed's letter did not include a certified copy of its trademark registration. (*Id.;* Graves Deal. ¶ 11.)

7. On June 18, 1996, Lockheed sent NSI a second letter, informing NSI that the registrant of "skunkworks.com" had agreed to stop using the domain name, and that the registrant of "skunkworks.net" was being

game "Clue." Hasbro had presented NSI with the federal registration of Hasbro's CLUE trademark, and demanded that NSI cancel Clue Computing's domain name registration. NSI attempted to extricate itself from between the two claimants by filing an interpleader action. However, the district court found that NSI was not a disinterested stakeholder because Clue Computing had accused it of breaching the domain name registration contract. 946 F.Supp. at 861.

sued in federal district court. (Quinto Decl. Ex. C.) The letter did not refer to the lawsuit by docket number or caption, nor did it include a copy of the complaint or other pleading. (*Id.*)

8. In September 1996, James McBride, a Missouri resident, acting as the administrative contact for SkunkWorx Industries, Ltd, registered the domain name "skunkworx.com" with NSI. (Quinto Decl. Ex. K.) The parties have not presented evidence of use of this domain name in connection with Web sites or other forms of communication.

9. On September 18, 1996, NSI's Internet business manager, David Graves, wrote to Lockheed's counsel in response to the May 7 and June 18 letters. NSI informed Lockheed that NSI could not provide a list of all domain names that included "skunk works" or any variation thereof, but that Lockheed could use the public "Whois" database of domain name registrations to find this information. NSI further informed Lockheed that upon receipt of a file-stamped copy of the complaint in the "skunkworks.net" case, NSI would immediately deposit the domain name in the registry of the court, maintaining the status quo until the court ordered otherwise. (Graves Decl. Ex. 5.)

10. In December 1996, Terry Robinson, a Texas resident, registered the domain name "the-skunkwerks.com" with NSI. (Quinto Decl. Ex. L.) The parties have not presented evidence of use of this domain name in connection with Web sites or other forms of communication.

11. On January 3, 1997, Peter Pasho, a resident of Canada, registered the domain name "theskunkworks.com" with NSI. (Quinto Decl. Ex. M.) Pasho has associated the domain name with a Web site offering his services as a Web site designer. (Quinto Decl. Ex. N.) As of April 9, 1997, this Web site included a page depicting a Lockheed-designed aircraft and briefly discussing its design at the Lockheed Skunk Works. (*Id.*)

### D. *Procedural Background*

Lockheed filed this action on October 22, 1996, alleging infringement, unfair competition, dilution and contributory infringement under the Lanham Act, and seeking injunctive and declaratory relief. NSI answered the complaint and counterclaimed for declaratory relief.

On March 19, 1997, this Court denied NSI's motion to dismiss for failure to join the domain name registrants as indispensable parties under Federal Rule of Civil Procedure 19(b). *Lockheed Martin Corp. v. Network Solutions, Inc.,* 43 U.S.P.Q.2d 1056, 1997 WL 381967 (C.D.Cal.1997).

On September 29, 1997, this Court denied Lockheed's motion to file a first amended complaint adding a cause of action for "contributory dilution." The Court denied the motion on the bases of futility, undue delay and prejudice.

NSI's present motion seeks summary judgment on all of Lockheed's claims.

### II. Discussion

This Court has subject matter jurisdiction over Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a). NSI has consented to personal jurisdiction by appearing in this action. Fed.R.Civ.P. 12(h)(1).

### A. *Standard for Summary Judgment*

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In order to defeat a motion for summary judgment, there must be facts in dispute that are both genuine and material, i.e., there must be facts upon which a fact finder could reasonably find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The court does not weigh the evidence or make credibility determinations; rather, the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

The initial burden of establishing that there is no genuine issue of material fact lies with the moving party. Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53;

*British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978). Once the movant has met this burden by producing evidence that, if left uncontroverted, would entitle the moving party to a directed verdict at trial, the burden shifts to the non-movant to present specific facts showing that there is a genuine issue of material fact. *See* Fed. R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Lake Nacimiento Ranch Co. v. San Luis Obispo,* 841 F.2d 872, 876 (9th Cir.1987).

Summary judgment is disfavored in trademark cases because of the inherently factual nature of most trademark disputes. *See Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1355 (9th Cir.1985). Nonetheless, summary judgment is appropriate "where the party opposing the motion fails to demonstrate the existence of any material issues of fact for trial." *Sykes Laboratory, Inc. v. Kalvin,* 610 F.Supp. 849, 860 (C.D.Cal.1985).

B. *Trademark Infringement Under Lanham Act Section 32, 15 U.S.C. § 1114(1)*

■ Section 32 of the Lanham Act prohibits any person from using another's mark without permission "in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive...." 15 U.S.C. § 1114(1). To be liable under section 32, a person must use the mark on competing or related goods in a way that creates a likelihood of confusion. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979). Before considering the likelihood of confusion, however, the Court must determine whether NSI, by accepting registrations, has used the SKUNK WORKS

mark in connection with the sale, distribution or advertising of goods or services. *See Planned Parenthood Fed'n of America, Inc. v. Bucci,* 42 U.S.P.Q.2d 1430, 1434, 1997 WL 133313 (S.D.N.Y.1997).

Domain names present a special problem under the Lanham Act because they are used for both a non-trademark technical purpose, to designate a set of computers on the Internet, and for trademark purposes, to identify an Internet user who offers goods or services on the Internet. *See* 2 Gilson, *supra,* §§ 5.11[3], at 5–235, 5.11[5], at 5–243–44 (distinguishing the technical use of domain names from the trademark use to identify goods or services). When a domain name is used only to indicate an address on the Internet, the domain name is not functioning as a trademark.[3] *See Walt–West Enters., Inc. v. Gannett Co., Inc.,* 695 F.2d 1050, 1059–60 (7th Cir.1982) (radio station frequency used in "utilitarian sense of calling the listener's attention to a location on the FM dial" is not protectable under trademark law). Like trade names, domain names can function as trademarks, and therefore can be used to infringe trademark rights. *See Accuride Int'l, Inc. v. Accuride Corp.,* 871 F.2d 1531 (9th Cir.1989). Domain names, like trade names, do not act as trademarks when they are used merely to identify a business entity; in order to infringe they must be used to identify the source of goods or services. *Cf. In re Unclaimed Salvage & Freight Co.,* 192 U.S.P.Q. 165, 168 (T.T.A.B.1976) (affirming refusal of registration of trade name as trademark where specimen demonstrated use only to identify applicant as a business); U.S. Dept. of Commerce, Patent and Trademark Office, Trademark Manual of Examining Procedure § 1202.02, at 1202–4 (2d ed. May 1993) (directing examiners to refuse

---

3. The Court takes judicial notice of a draft document prepared by the staff in the Office of the Assistant Commissioner for Trademarks of the United States Patent and Trademark Office entitled "Observations Concerning the Examination of Applications for Registration of Domain Names in the Trademark Office." This document directs trademark examiners to determine whether a domain name submitted for trademark registration functions only as a locator of a business on the Internet, in which case registration should be refused because the domain name is not serving a trademark function. While the Court's conclusion does not depend on this document or on any Patent and Trademark Office policy that it might reflect, the Court notes that trademark examiner practice is consistent with the view that the registration of a domain name with NSI for use on the Internet, without more, is not a commercial use of the name as a trademark under the Lanham Act. *See also,* 2 Gilson, *supra,* § 5.11[5], at 5–243–44 (noting Patent and Trademark Office practice regarding use-based registration of domain names as trademarks).

registration of material that functions only to identify a business).

NSI's acceptance of domain name registrations is connected only with the names' technical function on the Internet to designate a set of computers. By accepting registrations of domain names containing the words "skunk works," NSI is not using the SKUNK WORKS mark in connection with the sale, distribution or advertising of goods and services. NSI merely uses domain names to designate host computers on the Internet. This is the type of purely "nominative" function that is not prohibited by trademark law. *See New Kids on the Block v. New America Pub., Inc.*, 971 F.2d 302, 307 (9th Cir.1992) (noting that laws against infringement do not apply to "non-trademark use of a mark"); *Lucasfilm, Ltd. v. High Frontier*, 622 F.Supp. 931, 933 (D.D.C.1985) (holding that property rights in a trademark do not extend to the use of the trademark to express ideas unconnected with the sale or offer for sale of goods or services).

■ This is not to say that a domain name can never be used to infringe a trademark. However, something more than the registration of the name is required before the use of a domain name is infringing. In *Planned Parenthood Fed'n of America. Inc. v. Bucci*, for example, the defendant registered the domain name "plannedparenthood.com" and used it as the address of a Web site promoting his book on abortion. 42 U.S.P.Q.2d 1430, 1432, 1997 WL 133313 (S.D.N.Y.1997). The defendant admitted that he used the domain name hoping that people looking for the Planned Parenthood's site would find his site. *Id.* at 1433. The defendant argued that registration without more is not a commercial use of a mark. *Id.* at 1436–37. The court, however, found that the defendant did "more than merely register a domain name; he has created a home page that uses plaintiff's mark as its address, conveying the impression to Internet users that plaintiff is the sponsor of defendant's web site." *Id.* at 1437. The infringing use in *Planned Parenthood* was not registration of the plaintiff's mark with NSI, but rather the use of the plaintiff's trademark "as a domain name to identify his web site" in a manner that con-

fused Internet users as to the source or sponsorship of the products offered there. *Id.* at 1440; *cf. Teletech Customer Care Management (California), Inc. v. Tele–Tech Co.*, 42 U.S.P.Q.2d 1913, 1919, 977 F.Supp. 1407 (C.D.Cal.1997) (finding that the plaintiff was not likely to prevail on the merits of an infringement claim because the plaintiff demonstrated only that customers were likely to be confused as to location of Web site, not as to source of goods or services).

The cases dealing with vanity telephone numbers are consistent with the conclusion that registration of a domain name, without more, does not constitute use of the name as a trademark. A toll-free telephone number with an easy-to-remember letter equivalent is a valuable business asset. As with domain names, courts have held that the promotion of a confusingly similar telephone number may be enjoined as trademark infringement and unfair competition. *Dial–A–Mattress Franchise Corp. v. Page*, 880 F.2d 675, 678 (2d Cir.1989); *American Airlines, Inc. v. A 1–800–A–M–E–R–I–C–A–N Corp.*, 622 F.Supp. 673 (N.D.Ill.1985). The infringing act, however, is not the mere possession and use of the telephone number. If it were, trademark holders would be able to eliminate every toll-free number whose letter equivalent happens to correspond to a trademark. In *Holiday Inns, Inc., v. 800 Reservation, Inc.*, 86 F.3d 619 (6th Cir.1996), the district court held that the defendant's use of 1–800 H[zero]LIDAY infringed the plaintiff's trademark in the telephone number 1–800–HOLIDAY. *Id.* at 620. The court of appeals reversed, holding that Holiday Inns's trademark rights in its vanity telephone number did not allow it to control use by others of confusingly similar telephone numbers. Although the defendant's toll-free number was often misdialed by customers seeking 1–800–HOLIDAY, the defendant never promoted the number in connection with the HOLIDAY trademark; but only promoted it as 1–800–405–4329. *Id.* at 623. Because the defendant had used the number only as a telephone number, and not as a trademark, the court of appeals held that the defendant had not infringed the plaintiff's trademark. *Id.* at 625–26.

Domain names and vanity telephone numbers both have dual functions. Domain names, like telephone numbers, allow one machine to connect to another machine. Domain names, like telephone numbers, are also valuable to trademark holders when they make it easier for customers to find the trademark holder. Where the holder of a vanity telephone number promotes it in a way that causes a likelihood of confusion, the holder has engaged in an infringing use. *American Airlines*, 622 F.Supp. at 682 (mere use of telephone number is not infringing, but misleading use of trademarked term in yellow pages advertisement is infringing). But, where, as with NSI, the pure machine-linking function is the only use at issue, there is no trademark use and there can be no infringement.

In the ordinary trademark infringement case, where there is no question that the defendant used the mark, the analysis proceeds directly to the issue of whether there is a likelihood of confusion. Here, however, because NSI has not used Lockheed's service mark in connection with goods or services, the Court need not apply the test for likelihood of confusion. NSI, therefore, is entitled to judgment as a matter of law on the section 32 claim.

### 1. *Printer and Publisher Liability Under 15 U.S.C. § 1114(2)(A), (B)*

■ Lockheed asserts that NSI has infringed its service mark as a "printer" of the mark under 15 U.S.C. § 1114(2)(A). This assertion misapprehends NSI's function as a domain name registrar. To the extent that registrants of SKUNK WORKS-type domain names infringed the mark, they did so by using it on Web sites or other Internet resources in a way that created a likelihood of confusion as to source or sponsorship. NSI is not an Internet service provider. It does not provide host computers for Web sites or other Internet resources. NSI's role is restricted to publishing a list of domain names, their holders, and the IP numbers of the domain name servers that perform the directory functions associated with the domain names. (Graves Decl. ¶ 10.)

NSI's role is fundamentally dissimilar from that of telephone directory publishers

whose conduct has been found enjoinable under § 1114(2)(A). *See Century 21 Real Estate Corp. of Northern Illinois v. R.M. Post Inc.*, 8 U.S.P.Q.2d 1614, 1617, 1988 WL 84741 (N.D.Ill.1988) (denying motion to dismiss where yellow pages' publishers were alleged to have printed infringing trademark in listing of former licensee who no longer had right to use trademark). There, the telephone directory printers supplied the material that directly caused the likelihood of confusion. In the domain name context, the domain name registration itself does not infringe the trademark. Infringement occurs when the domain name is used in certain ways. For example, a domain name may infringe trademark rights when it is used in connection with a Web site that advertises services in competition with those of the trademark owner. *See, e.g., Cardservice International, Inc. v. McGee*, 950 F.Supp. 737, 738 (E.D.Va.1997); *Comp Examiner Agency, Inc. v. Juris, Inc.*, 1996 WL 376600 (C.D.Cal. 1996). Where domain names are used to infringe, the infringement does not result from NSI's publication of the domain name list, but from the registrant's use of the name on a Web site or other Internet form of communication in connection with goods or services. NSI is not a "printer or publisher" of Web sites, or any other form of Internet "publication." As discussed below in the section on contributory infringement, NSI's involvement with the use of domain names does not extend beyond registration. NSI's liability cannot be premised on an argument that it prints or publishes the list of domain names, because the list is not the instrument or forum for infringement. NSI's liability, if it exists at all, would stem from registrants' use of domain names in connection with other services not provided by NSI. This type of liability is properly analyzed under contributory liability doctrine, not as printer and publisher liability under § 1114(2)(A).

### C. *Unfair Competition Under Lanham Act Section 43(a), 15 U.S.C. § 1125(a)*

■ Lockheed has followed the common practice of alleging unfair competition under section 43(a) of the Lanham Act along with trademark infringement under section 32.

Both causes of action depend on a demonstration of a likelihood of confusion. 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2:8 (1997). Federal unfair competition requires use of the mark in connection with goods or services. 15 U.S.C. § 1125(a)(1). As discussed above, NSI's acceptance of registrations for domain names resembling SKUNK WORKS is not a use of the mark in connection with goods or services.

A recent district court decision illustrates the application of federal unfair competition law to the domain name context. *Juno Online Servs., L.P. v. Juno Lighting, Inc.,* 979 F.Supp. 684 (N.D.Ill. Sept.29, 1997). During a dispute over the domain name "juno.com," Juno Lighting registered the domain name "juno-online.com" in the hopes of persuading Juno Online Services to switch its e-mail service to that domain name. Juno Online sued Juno Lighting for federal unfair competition. The district court dismissed the unfair competition claim because Juno Online alleged only that Juno Lighting registered the name with NSI, and did not allege further use of the name to create a Web site or to advertise its services. *Id.* at 690–92. The court held that registration of a trademark as a domain name does not constitute use of the trademark on the Internet in connection with goods or services, and therefore was not prohibited by section 43(a). *Id.* This reasoning applies more strongly to NSI, which has not registered domain names resembling SKUNK WORKS for its own use, but has merely accepted domain name registrations from others.

D. *Trademark Dilution Under the Federal Trademark Dilution Act of 1995, Lanham Act Section 43(c), 15 U.S.C. § 1125(c)*

■ Trademark dilution laws protect "famous" marks from certain unauthorized uses regardless of a showing of competition, relatedness or likelihood of confusion. The federal dilution statute entitles the owner of a famous mark to enjoin "another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark...." 15 U.S.C. § 1125(c)(1). Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127. The Federal Trademark Dilution Act specifically excludes non-commercial use of a mark from its coverage. 15 U.S.C. § 1125(c)(4)(B).

NSI's acceptance of domain name registrations is not a "commercial use" within the meaning of the Federal Trademark Dilution Act. Lockheed argues that NSI engages in commercial use because the registration of SKUNK WORKS-type domain names inhibits Lockheed's ability to use its service mark as a domain name. (Opp'n at 29.) Lockheed contends that NSI's conduct is similar to that of the defendant in *Panavision Int'l, L.P. v. Toeppen,* 945 F.Supp. 1296, 1299 (C.D.Cal.1996). In *Panavision,* the defendant, Toeppen, was a "cybersquatter," an entrepreneur who made a business of registering trademarks as domain names for the purpose of selling them later to the trademarks' owners. *Panavision,* 945 F.Supp. at 1303. The court held that Toeppen "traded on the value of the marks as marks by attempting to sell the domain names to Panavision." *Id.* The court found that "[t]his conduct injured Panavision by preventing Panavision from exploiting its marks and it injured customers because it would have been difficult to locate Panavision's web site if Panavision had established a web site under a name other than its own." *Id.; see also Intermatic Inc. v. Toeppen,* 947 F.Supp. 1227, 1239 (N.D.Ill.1996) (holding that defendant's use of the mark was diluting because it prevented plaintiff from using it). Lockheed's argument implies that any conduct that makes it more difficult for Lockheed to establish a presence on the Internet is diluting conduct. This argument is flawed. In *Panavision* and *Intermatic,* the fact that the defendant's conduct impeded plaintiff's use of its trademark as a domain name was not the determining factor in finding that the defendant's use was diluting. If impeding use of the trademark as a domain name were the

only factor, the court in *Panavision* would not have asserted that registration of a trademark "as a domain name, without more, is not a commercial use of the trademark and therefore not within the prohibitions of the Act." *Panavision*, 945 F.Supp. at 1303. All prior domain name registrations corresponding to words in a trademark impede the trademark owner's use of the same words for use as a domain name. The Internet, however, is not exclusively a medium of commerce. The non-commercial use of a domain name that impedes a trademark owner's use of that domain name does not constitute dilution.[4] In *Intermatic* and *Panavision*, the defendant's use was commercial because the defendant sought to "arbitrage" the trademarks for their value as domain names. *Intermatic*, 947 F.Supp. at 1239; *Panavision*, 945 F.Supp. at 1303. Lockheed argues that NSI is engaged in commercial use of its service mark because NSI seeks to maximize the number of domain names registered in order to maximize its revenue and profits. (Opp'n at 27.) Lockheed cites statements in NSI's Initial Public Offering registration statement ("IPO")[5] to the effect that part of NSI's strategy for growth is to stimulate demand for domain names in targeted customer segments, including among trademark owners. (*Id.; see* Rierson Decl. Ex. B.) Lockheed contends that like Toeppen, NSI trades on the value of domain names by "selling" registrations to as many people as possible. (*Id.*) NSI, however, does not trade on the value of domain names as trademarks. NSI's use of domain names is connected to the names' technical function on the Internet to designate computer addresses, not to the names' trademark function to distinguish goods and services. The fact that NSI makes a profit from the technical function of domain names does not convert NSI's activity to trademark use. *See New Kids*, 971 F.2d at 309. The Court does not question that a domain name which is easily deducible from a trademark is a valuable asset to the trademark owner. Such a domain name makes it easier for the trademark owner's customers to find the trademark owner's Internet resources such as Web sites. But a domain name's correspondence to a trademark does not make the domain name any more valuable to NSI, whose only interest in a domain name is as a pointer to an IP number. NSI, unlike the defendant in *Intermatic* and *Panavision*, does not make a commercial use of domain names by trading on their value as trademarks.

Because the Court finds as a matter of law that NSI does not make commercial use of domain names as trademarks, Lockheed cannot prevail on its dilution claim. The Court therefore does not address the other dilution elements.

### E. *Contributory Infringement*

Lockheed asserts that NSI is liable for contributory infringement of the SKUNK WORKS mark because NSI accepted registrations of domain names similar to the mark and refused to cancel the registrations in response to Lockheed's demands. Contributory infringement doctrine extends liability to reach manufacturers and distributors who do not themselves use the mark in connection with the sale of goods, but who induce such use by supplying goods to direct infringers. Liability for contributory infringement requires that the defendant either "(1) intentionally induces another to infringe on a trademark or (2) continues to supply a product knowing that the recipient is using the

4. It is important to note that impeding access to a domain name is not the same thing as impeding access to the Internet. Even if a trademark owner cannot establish a "vanity" domain name, the owner remains free to promote the trademark on the Internet by using the trademark in the content of a Web site. A Web site's content is not connected to or restricted by the domain name under which it is accessed. *See* David J. Loundy, *A Primer on Trademark Law and Internet Addresses*, 15 J. Marshall J. Computer & Info. L. 465, 480 n. 86 (1997). In addition, the trademark owner may use the trademarked words as

a third-level domain name, or as a second-level domain name in combination with letters that distinguish it from previously registered second-level domains. A domain name dispute between Acme Plumbing and Acme Pizza, for example, can be resolved by adding more information to the second-level domain names, as in "acmeplumbing.com" and "acmepizza.com."

5. NSI objects to the IPO as inadmissible hearsay. The IPO is admissible as an admission of a party opponent. Fed.R.Evid. 801(d)(2).

product to engage in trademark infringement." *Fonovisa Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir.1996) (citing the test set forth in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 853–54, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982)). Lockheed does not contend that NSI induced infringement. No evidence has been presented to indicate inducement. The issue, therefore, is whether Lockheed has created a genuine issue as to the knowledge prong of the *Inwood* test.

Following *Inwood,* courts have extended liability for trademark infringement beyond direct infringers, but only under certain circumstances. *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.,* 967 F.2d 1516, 1521 (11th Cir.1992). The clearest circumstances for extending liability are those presented by *Inwood* itself. There, a pharmaceutical manufacturer supplied generic drugs that some pharmacists mislabeled as brand-name drugs. Each extension of contributory liability doctrine beyond defendants who manufacture or distribute a mislabeled product has required careful examination of the circumstances to determine whether knowledge of infringement should be imputed to the alleged contributory infringer. *See Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.,* 955 F.2d 1143, 1148 (7th Cir.1992) (holding that the landlord/tenant relationship between a flea market operator and vendors provides a basis for extending contributory trademark infringement doctrine in circumstances indicating willful blindness of the flea market operator toward the vendors' blatantly infringing acts); *Fonovisa,* 76 F.3d at 265 (same); *Mini Maid,* 967 F.2d at 1522 (extending contributory liability doctrine to a franchisor/franchisee relationship but holding that the district court erred in finding contributory liability based on the franchisor's failure to supervise the franchisee with reasonable diligence). Lockheed now asks that the Court extend contributory liability to the relationship between a domain name registrar and domain name registrants who are alleged to have directly infringed Lockheed's mark.

NSI is involved only in the registration of domain names, not in the use of domain names in connection with goods and services on the Internet. (Graves Decl. ¶ 10); *cf. Intermatic,* 947 F.Supp. at 1231–32 (noting that there is no technical connection between domain name service and contents of Web sites or other Internet resources). NSI does not provide the other services needed to use the domain name in association with a Web site or other means of communication on the Internet. The services necessary to maintain a Web site, such as an IP address, communications, computer processing and storage are performed by Internet service providers ("ISP") who provide the host computers and connections necessary for communications on the Internet. It is not necessary to secure a second-level domain name registration in order to establish a presence on the Internet. Users may simply use the second-level domain name of the ISP. Where domain name registration is necessary, the ISP usually acts as an agent to secure and maintain the registration. *See Domain Name System, Hearings Before the Subcomm. on Basic Research of the House Science Comm.,* 105th Cong., 1997 WL 14151463 (September 30, 1997) (testimony of Barbara A. Dooley, Executive Director, Commercial Internet Exchange Association) (noting that most users rely on ISPs to act as agents to secure and maintain registrations, and that ISPs are the primary providers with a close relationship to end users).

The registration of a domain name, without more, does not amount to infringement of a mark similar to the name. *Panavision,* 945 F.Supp. at 1303. Infringing acts occur when a domain name is used in a Web site or other Internet form of communication in connection with goods or services. *Planned Parenthood Fed'n of America v. Bucci,* 42 U.S.P.Q.2d 1430, 1437, 1997 WL 133313 (S.D.N.Y.1997). After a domain name is registered, NSI's involvement is over. NSI is not part of the process of linking domain names with potentially infringing resources such as Web sites. NSI does not require holders to use domain names for Web sites or any other form of

Internet communication.[6] Nor do domain name holders need NSI's permission to do so.

Because NSI's involvement with the Internet is remote from domain name uses that are capable of infringement, Lockheed's reliance on the flea market cases, *Fonovisa* and *Hard Rock,* is misplaced. In *Hard Rock,* the Seventh Circuit noted that the common law of landlord/tenant relations imposes vicarious liability on a landlord who knows or has reason to know of the tortious activity of those whom the landlord permits on the landlord's premises. *Hard Rock,* 955 F.2d at 1149. Because the landlord/tenant standard is similar to the *Inwood* standard for contributory infringement by manufacturers, the court held that the *Inwood* standard should apply to flea market operators who lease space to vendors. *Id.* This holding was further supported by the district court's finding that the flea market operator not only rented space, but also advertised and promoted the activity on its premises, sold tickets and directly supervised the premises. *Id.* at 1148. In *Fonovisa,* the Ninth Circuit adopted *Hard Rock's* analogy between landlord/tenant vicarious liability and trademark law contributory liability in order to extend the *Inwood* standard to the flea market context. *Fonovisa,* 76 F.3d at 265. There, too, the court found that the flea market operator provided more than space, and was directly and substantially involved in the businesses of the infringing vendors. *Id.* at 264.

■ The flea market operators directly controlled and monitored their premises. NSI neither controls nor monitors the Internet. A domain name, once registered, can be used in connection with thousands of pages of constantly changing information. While the landlord of a flea market might reasonably be expected to monitor the merchandise sold on his premises, NSI cannot reasonably be expected to monitor the Internet. *See American Civil Liberties Union of Georgia v. Reno,* 929 F.Supp. 824, 832 (E.D.Pa.1996), *aff'd,* —— U.S. ——, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("There is no centralized storage location, control point, or communications channel for the Internet, and it would not be technically feasible for a single entity to control all of the information conveyed on the Internet."). NSI's role in the Internet is distinguishable from that of an Internet service provider whose computers provide the actual storage and communications for infringing material, and who therefore might be more accurately compared to the flea market vendors in *Fonovisa* and *Hard Rock.*[7] *See Religious Technology Center v. Netcom On–Line Communication Services, Inc.,* 907 F.Supp. 1361, 1373 (N.D.Cal.1995).

■ Because NSI's involvement with potentially infringing uses of domain names is remote, the Court finds that it is inappropriate to extend contributory liability to NSI absent a showing that NSI had unequivocal knowledge that a domain name was being used to infringe a trademark.

---

6. Lockheed asserts that NSI's domain name dispute policy requires registrants to use their domain names. (Quinto Decl. in Opp'n to Ex Parte Application for Civil Contempt ¶ 8.) Lockheed points to the section of the policy that requires registrants "to have operational name service from at least two operational domain name servers...." (*Id.,* Ex. E.) This language is quoted from a section of the policy under the heading "Connectivity." This section does not require the registrant to connect the domain name with any content on the Internet, such as a Web site. It merely requires the registrant to secure the use of two domain name servers to list the domain name in connection with an IP number. Requiring registrants to link their domain names with IP numbers is not the same thing as requiring registrants to use their domain names on the Internet.

7. The Court notes, however, that the tort law analogy used in *Fonovisa* and *Hard Rock* probably would not apply to Internet service providers any better than it applies to NSI. Even though Internet service providers directly provide the storage and communications facilities for Internet communication, they cannot be held liable merely for failing to monitor the information posted on their computers for tortious content. *See Zeran v. America Online, Inc.,* 129 F.3d 327, 330–31 (4th Cir.1997) (noting that Congress created a tort immunity for Internet service providers in the Communications Decency Act of 1996, 47 U.S.C. § 230, because "[i]t would be impossible for service providers to screen each of their millions of postings for possible problems"); *but see* 47 U.S.C. § 230(d)(2) (providing that the tort immunity does not limit or expand any law pertaining to intellectual property).

### 1. *NSI's Knowledge*

The mere assertion by a trademark owner that a domain name infringes its mark is not sufficient to impute knowledge of infringement to NSI. The use of an identical or similar mark does not necessarily constitute infringement. In order to be infringing, such use must be in connection with goods or services that are competitive with, or at least related to, the goods or services for which the trademark has been registered or used in commerce. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979). The use must also cause a likelihood of confusion as to origin or sponsorship. *Id.* Whether a use is likely to cause confusion depends on numerous variables including the strength of the mark, the proximity of the goods, the similarity of the marks, evidence of actual confusion, marketing channels used, the type of goods and degree of care used by purchasers, the defendant's intent in selecting the mark, and the likelihood of expansion of product lines. *Eclipse Associates Ltd. v. Data General Corp.,* 894 F.2d 1114, 1117 (9th Cir.1990).

NSI's registration form requires the applicant to state the purpose of the domain name registration. Lockheed contends that NSI receives sufficient information on the form to know whether a domain name registration will be used to infringe a mark, and that the use of the form satisfies the knowledge element of contributory infringement doctrine. The form instructs the applicant to "[b]riefly describe the domain name Registrant and the purpose for which this domain name is being applied." (Quinto Decl. in Opp'n to Ex Parte Application for Order Finding Civil Contempt, Ex. C.) Infringement depends on likelihood of confusion. The likelihood of confusion test examines the totality of circumstances under which a mark is used. *See Eclipse,* 894 F.2d at 1118. The outcome of the test cannot be predicted from an examination of the mark and the domain name in connection with a brief statement of the purpose for which the mark is being used. A reasonable person in NSI's position could not presume infringement even where the domain name is identical to a mark and registered for use in connection with a similar or identical purpose. *See Taj Mahal Enterprises, Ltd. v. Trump,* 745 F.Supp. 240 (D.N.J.1990) (finding insufficient likelihood of confusion between TAJ MAHAL mark as used by restaurant and TAJ MAHAL mark as used by casino and hotel complex which included several restaurants); *Church of the Larger Fellowship, Unitarian Universalist v. Conservation Law Foundation of New England, Inc.,* 221 U.S.P.Q. 869, 1983 WL 52338 (D.Mass.1983) (finding insufficient likelihood of confusion between plaintiff's use of CLF mark for direct mail charitable solicitation and defendant's use of CLF mark for same purpose in same city); *Pump, Inc. v. Collins Management, Inc.,* 746 F.Supp. 1159 (D.Mass.1990) (granting defendant's motion for summary judgment, finding insufficient likelihood of confusion between plaintiff's use of PUMP for purpose of promoting rock band and defendant's use of PUMP for same purpose). The receipt of a brief statement of purpose from domain name applicants does not give NSI sufficient information for the Court to impute knowledge of future infringing uses to NSI.

An owner's rights in a trademark do not remain stable over time. The scope of the owner's rights is subject to contraction if the trademark is abandoned or becomes generic for all or part of the goods or services identified. This dynamic nature of trademark rights increases their inherent uncertainty. Lockheed concedes that the Lanham Act recognizes that a mark may become generic for a portion of the goods or services for which it is registered, causing the owner to lose trademark protection against use of the mark in connection with such goods. (Lockheed's Separate Statement of Genuine Issues at 11); 15 U.S.C. § 1064 (providing for cancellation of trademark registration with respect to goods and services for which mark has become generic). NSI submits evidence of numerous third-party uses of the term "skunk works" to describe a type of corporate management style. (Jones Decl. Exs. 14–44 (newspaper, magazine and trade journal articles describing "skunk works" at companies including IBM, Chrysler, General Motors, Buick, Compaq, Patagonia and Bell Atlantic)). "Skunk works" is defined in the 1996 American Heritage Dictionary as "[a] small

loosely structured corporate research and development unit or subsidiary formed to foster innovation." (Jones Decl. Ex. 9.) Parallel generic meanings do not remove trademark protection over uses of the trademarked term to distinguish the source of goods. 2 McCarthy § 12:3. The trademark owner, however, does not have protection against purely generic or nominative uses of the term that do not serve to distinguish goods or services.[8] 15 U.S.C. § 1064; *New Kids on the Block v. New America Pub., Inc.*, 971 F.2d 302 (9th Cir.1992); *Lucasfilm, Ltd. v. High Frontier*, 622 F.Supp. 931 (D.D.C. 1985). The existence of numerous legitimate, non-infringing uses of the term "skunk works" further illustrates the uncertainty inherent in the question of whether NSI knew or had reason to know of infringing uses of domain name registrations.[9]

Additionally, trademark law permits multiple parties to use and register the same mark for different classes of goods and services. NSI points to United States Trademark Registration 1,941,484 for SKUNKWORKS PUBLISHING for use on printed publications relating to business. (Jones Decl. Ex. 45.) The applicant was required to disclaim any rights to PUBLISHING apart from the mark as shown. (*Id.* Ex. 46.) Where a party disclaims portions of the mark, the un-disclaimed portions are considered "dominant" for purposes of customer confusion. *In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1407 (Fed.Cir.1997) (holding that there was a likelihood of confusion between THE DELTA CAFE and DELTA where the owner of the former trademark disclaimed CAFE). Therefore, for purposes of determining possible infringement by the domain name "skunkworks.com," SKUNK WORKS and SKUNKWORKS PUBLISH-ING are the same mark. If NSI had received letters from both Lockheed and the registered owner of SKUNKWORKS PUBLISHING, it would have no basis for deciding which party's rights placed NSI at greater risk of liability for contributory infringement. The proper course of action in such a situation would be for NSI to initiate an interpleader action, placing the domain name in the registry of the court and allowing the claimants to adjudicate the question of whether one claimant's trademark rights allowed exclusive use of the mark as an Internet domain name. (*See* Grave Decl. Ex. 1 (domain name dispute policy).)

In holding that the degree of uncertainty over infringing uses of domain names makes it inappropriate to impose contributory liability on NSI, the Court is not making new trademark rules for the Internet. Contributory infringement doctrine has always treated uncertainty of infringement as relevant to the question of an alleged contributory infringer's knowledge. *See Mini Maid*, 967 F.2d at 1521 (instructing district court to consider extent and nature of alleged infringement in determining whether to impute knowledge to alleged contributory infringer); Restatement (Third) of Unfair Competition § 26 cmt. a (1993) (noting that a person's liability for contributory infringement "depends upon the nature of the business relationship between the person and the direct infringer and the knowledge attributable to the person on the basis of that relationship"). A trademark owner's demand letter is insufficient to resolve this inherent uncertainty. *Coca–Cola Co. v. Snow Crest Beverages*, 64 F.Supp. 980 (D.Mass.1946), *aff'd*, 162 F.2d 280 (1st Cir.1947), a seminal contributory infringement case, addressed the contention

---

8. The uncertainty of Lockheed's rights over potentially generic uses of words similar to its mark is made greater in this case by the breadth of the preemptive rights asserted by Lockheed. NSI propounded an interrogatory asking Lockheed to identify all alphanumeric strings whose inclusion in a domain name would infringe Lockheed's service mark. Lockheed objected to the interrogatory as unduly burdensome, and answered with 24 phrases that would infringe, including the word "skunk." (Jones Decl. Ex. 1.)

9. Internet users may also have a free speech interest in non-infringing uses of domain names that are similar or identical to trademarks. *See American Civil Liberties Union of Georgia v. Miller*, 977 F.Supp. 1228, 1233–34 (N.D.Ga.1997) (invalidating as overbroad statute that criminalized certain uses of trademarks on the Internet by persons other than trademark owner because statute would have prohibited "use of trade names or logos in non-commercial educational speech, news, and commentary—a prohibition

offered here by Lockheed that an attorney's demand letter should be sufficient to impute knowledge of infringement. There, Coca–Cola asserted that Snow Crest had contributorily infringed its mark by selling "Polar Cola" to bartenders who sometimes mixed the soda into customers' "rum and Coke" drinks. *Coca–Cola*, 64 F.Supp. at 989. Coca–Cola asserted that Snow Crest should have known about the infringement because Coca–Cola's counsel had told Snow Crest's president of the bartending practice. The court found that such "lawyer's argumentative talk" was insufficient to establish that a reasonable business person in Snow Crest's position should have concluded that its products were being used to infringe. *Id.* at 990. The court reasoned that if it imputed knowledge to the defendant based on Coca–Cola's blanket demand, the court would be expanding Coca–Cola's property right in its trademark, allowing Coca–Cola to secure a monopoly over the entire mixed drink trade. *Id.* The same reasoning applies here. Lockheed's argument would require the Court to impute knowledge of infringement to NSI in circumstances where the use of the term "skunk works" in a domain name may or may not be infringing. Such an expansion of contributory liability would give Lockheed a right in gross to control all uses of "skunk works" in domain names.

Lockheed relies on a copyright contributory infringement case, *Religious Technology Center v. Netcom On–Line Communication Servs., Inc.*, 907 F.Supp. 1361 (N.D.Cal.1995), for the proposition that only a low level of certainty as to infringement should be required to impute knowledge to NSI. There, the court rejected an Internet service provider's argument that its knowledge of infringement must be unequivocal in order for it to face contributory liability. *Id.* at 1374. At the same time the court noted that a "mere unsupported allegation of infringement by a copyright owner" is not enough to impute knowledge to an Internet service provider.

*Id.* The court noted that where infringement is uncertain for a variety of reasons such as lack of copyright notice or a colorable fair use defense, the Internet service provider's "lack of knowledge will be found reasonable and there will be no liability for contributory infringement...." *Id.* Because the property right protected by trademark law is narrower than that protected by copyright law, liability for contributory infringement of a trademark is narrower than liability for contributory infringement of a copyright. *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n. 19, 104 S.Ct. 774, 787 n. 19, 78 L.Ed.2d 574, (1984). Unlike trademark law, copyright law gives owners a generalized right to prohibit all copying, provided that the owner's rights are valid and the material copied is original. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 360, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). Trademark law, on the other hand, tolerates a broad range of non-infringing uses of words that are identical or similar to trademarks.

2. *Knowledge as to Specific Registrants*

 Lockheed's complaint alleges contributory infringement in connection with four specific registrations of SKUNK WORKS-type domain names. In addition, Lockheed has submitted evidence in opposition to summary judgment of four subsequent registrations of domain names similar to SKUNK WORKS. (Quinto Decl. Exs. H, K, L, M.) As to all of the domain name registrations, the Court finds that the alleged infringing activity did not give NSI knowledge or reason to know that its domain name registration service was being used to infringe Lockheed's service mark.

 Two of the four original registrants never used their domain name in connection with a Web site or other form of Internet communication that would create a likelihood of confusion.[10] The other two registrants used their domain names, one in association

with well-recognized First Amendment problems").

**10.** Seng–Poh Lee's "skunkworks.com" name was used to establish an e-mail forwarder. Mr. Lee never received or sent e-mail using the domain name. (Jones Decl. Ex. 3.) After receiving a cease-and-desist letter from Lockheed, Mr. Lee

canceled his domain name registration. The domain name became generally available and was registered to a new user, Grant Smith, in 1996.

Ken Hoang's "skunkworks.net" was not used in association with a Web site or any other Internet form of communication. (Jones Decl. Ex. 6.)

with Web site,[11] and one as an e-mail address.[12] As discussed above, however, NSI is not involved with uses of domain names in connection with Internet resources such as Web sites and e-mail. Therefore, the Court cannot impute knowledge of potential infringement merely from the fact that such uses occurred. NSI, as a domain name registrar, has no affirmative duty to police the Internet in search of potentially infringing uses of domain names. *Hard Rock*, 955 F.2d at 1149 (flea market operator had no affirmative duty to take precautions against infringement by vendors); *MDT Corp. v. New York Stock Exchange, Inc.*, 858 F.Supp. 1028, 1034 (C.D.Cal.1994). Lockheed's May 7, 1996 and June 18, 1996 demand letters do not notify NSI of any post-registration uses such as Web sites or e-mail, but merely assert that the domain names have been registered and demand their cancellation. (Quinto Decl. Exs. A & C.) Considering the uncertainty inherent in any determination that use of a domain name is infringing, the Court finds that Lockheed has failed to raise a triable issue as to NSI's knowledge of infringing uses of its services.

The parties have presented no evidence regarding use on the Internet of three of the four domain names registered since Lockheed filed its complaint. The remaining registration, that of Peter Pasho, was used in connection with a Web site. Lockheed has presented a print-out of a Web page associated with the domain name "theskunkworks.com," registered to Pasho. (Quinto Decl. Ex. N.) The Web site includes a depiction of Lockheed's SR–71 spy plane and a definition of the term "skunk works" that refers to the Lockheed facility. (*Id.*) Lockheed argues that the use of the domain name "theskunkworks.com" in connection with this Web site raises the possibility of confusion over possible sponsorship by Lockheed. This argument is tenuous given the fact that the services promoted on the page are Web site design, not aerospace design. But Lockheed makes a colorable claim that where a strong mark is concerned, the use of a trademark on different products can be infringing if customers would be led to infer sponsorship. *HMH Publishing Co. v. Brincat*, 504 F.2d 713, 717 (9th Cir.1974).

Lockheed, however, has not demonstrated that NSI was involved with or had reason to know about this Web site. *NSI's* management of the domain name registration process does not include a content review of Web sites and other Internet resources associated with a domain name. Although the use of the domain name "theskunkworks.com" might contribute to a likelihood of confusion as to sponsorship, NSI did not supply the domain name to Pasho. Registrants choose their own domain names. NSI, therefore, cannot be compared to a manufacturer who chooses to make generic pills that can be easily substituted for pills with protected trade dress, *Inwood*, 456 U.S. at 848–50, 102 S.Ct. at 2185–86, or a mattress manufacturer who chooses to cover box springs with fabric pattern identical to that retailed by another company. *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1382 (9th Cir. 1984). Nor can NSI be compared to the flea market operators who provide space, parking, food service and advertising to vendors selling infringing merchandise. If Pasho's use of the domain name "theskunkworks.com" creates a likelihood of confusion, it does so only in combination with the content of the Web page. The Web page exists on Pasho's computer or on an Internet service provider's computer. NSI does not provide computer storage, processing or communications for Web sites. NSI's role in Pasho's possible infringement is therefore not similar to the role of the flea market vendors, who provided a substantial portion

---

**11.** Roger Barski's "skunkwerks.com" domain name was associated with a Web site offering Mr. Barski's services as a Web site designer. (Jones Decl. Ex. 5.) After receiving Lockheed's cease-and-desist letter, Mr. Barski canceled the Internet service provider account that had supplied domain name service for "skunkwerks.com." Without domain name service, the domain name is effectively removed from the Internet, because users who attempt to access Internet resources associated with the domain name receive only an error message. (*Id.*)

**12.** Kathy Huber's "skunkwrks.com" was not associated with a Web site, but was associated with an e-mail address for Ms. Huber's former company, Skunkworks Marketing Labs. (Jones Decl. Ex. 4.)

of the services needed for the vendor's infringing activities, and on whose premises the infringing activities occurred. *Fonovisa*, 76 F.3d 259, 265; *Hard Rock*, 955 F.2d at 1149.

### 3. *Conclusion as to Contributory Infringement*

Lockheed bears the burden of proving that NSI induced infringement, or continued to supply a product when it knew or should have known that its customers were using the product to infringe Lockheed's mark. *See Inwood*, 456 U.S. at 853–54, 102 S.Ct. at 2188. Lockheed asserts in its Separate Statement of Genuine Issues that NSI is not entitled to summary judgment because NSI "has not adduced any evidence" regarding infringement by its registrants. (Plaintiff's Separate Statement ¶ 23.) It is not NSI's burden on summary judgment to negate the elements of Lockheed's case. The moving party on summary judgment need not produce evidence showing the absence of a genuine issue of material fact with respect to issues on which the non-moving party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party need only point out to the district court that there is an absence of evidence to support the non-moving party's case. *Id.*

NSI has met this burden. Lockheed's evidence would only establish liability for contributory infringement if NSI had an affirmative duty to police the Internet for infringing uses of Lockheed's service mark. No such duty exists. Lockheed's evidence does not show that NSI was involved in infringing activity or that it knew or had reason to know that its services were being used to infringe Lockheed's service mark. The Court finds that knowledge of infringement cannot be imputed to NSI because of the inherent uncertainty of trademark protection in domain names. Even after receiving Lockheed's demand letters NSI would not have reason to know that the holders of SKUNK WORKS–type domain names were infringing. Trademark law does not give Lockheed the right to interfere with all uses of the term "skunk works" by current domain name holders.

Because of the inherent uncertainty of a trademark owner's right to stop others from using words corresponding to the owner's trademark in a domain name, the Court finds that an extension of contributory liability here would improperly broaden Lockheed's property rights in its service mark.

### III. Conclusion

The Court finds that NSI's use of domain names is connected with their technical function to designate computers on the Internet, not with their trademark function to identify the source of goods and services. Because Lockheed cannot establish that NSI has used its service mark in connection with goods or services or with the sale, offer for sale, distribution or advertising of goods and services, the Court grants summary judgment for NSI on the direct infringement and unfair competition claims under 15 U.S.C. §§ 1114(1), 1125(a).

Because the Court finds that NSI's acceptance of domain name registrations is not a commercial use within the meaning of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c), the Court grants summary judgment for NSI on the dilution claim.

Because NSI has demonstrated that Lockheed cannot establish that NSI knew or had reason to know that its domain name registration service was used to infringe Lockheed's mark, the Court grants summary judgment for NSI on the contributory infringement claim.

Because summary judgment on the above claims is based on Lockheed's lack of a legal right to control the domain name registration process, there is no case or controversy between these parties. Therefore, the Court grants NSI's motion for summary judgment as to Lockheed's declaratory judgment cause of action.

If the Internet were a technically ideal system for commercial exploitation, then every trademark owner would be able to have a domain name identical to its trademark. But the parts of the Internet that perform the critical addressing functions still operate on the 1960s and 1970s technologies that were adequate when the Internet's function was to facilitate academic and military research.

Commerce has entered the Internet only recently. In response, the Internet's existing addressing systems will have to evolve to accommodate conflicts among holders of intellectual property rights, and conflicts between commercial and non-commercial users of the Internet. "In the long run, the most appropriate technology to access Web sites and e-mail will be directories that point to the desired Internet address. Directory technology of the necessary scale and complexity is not yet available, but when it is developed it will relieve much of the pressure on domain names." *Domain Name System, Hearings Before the Subcommittee on Basic Research of the House Science Committee,* 105th Cong., 1997 WL 14151463 (September 30, 1997) (testimony of Barbara A. Dooley, Executive Director, Commercial Internet Exchange Association). No doubt trademark owners would like to make the Internet safe for their intellectual property rights by reordering the allocation of existing domain names so that each trademark owner automatically owned the domain name corresponding to the owner's mark. Creating an exact match between Internet addresses and trademarks will require overcoming the problem of concurrent uses of the same trademark in different classes of goods and geographical areas. Various solutions to this problem are being discussed, such as a graphically-based Internet directory that would allow the presentation of trademarks in conjunction with distinguishing logos, new top-level domains for each class of goods, or a new top-level domain for trademarks only. The solution to the current difficulties faced by trademark owners on the Internet lies in this sort of technical innovation, not in attempts to assert trademark rights over legitimate non-trademark uses of this important new means of communication.