RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0177P (6th Cir.)
File Name: 02a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DARRELL J. BIRD,
    *Plaintiff-Appellant,*

    *v.*

MARSHALL PARSONS,
    *Defendant,*

STEPHEN VINCENT, GEORGE
DECARLO, DOTSTER, INC.,
and AFTERNIC.COM, INC.,
    *Defendants-Appellees.*

No. 00-4556

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 00-00266—Michael R. Merz, Magistrate Judge.

Submitted: March 22, 2002

Decided and Filed: May 21, 2002

Before: NORRIS, SILER, and GILMAN, Circuit Judges.

---

**COUNSEL**

---

**ON BRIEF:** Richard S. Lovering, BRICKER & ECKLER, Columbus, Ohio, Kevin A. Bowman, SEBALY, SHILLITO & DYER, Dayton, Ohio, for Appellees. Darrell J. Bird, Dayton, Ohio, pro se.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Darrell J. Bird, an Ohio citizen proceeding pro se, brought this lawsuit alleging various violations of federal copyright and trademark law against Afternic.com, Inc., Dotster, Inc., George DeCarlo, Marshall Parsons, and Steven Vincent. Dotster, DeCarlo, and Vincent are citizens of Washington, Afternic has its headquarters in New York, and Parsons resides in California. Bird's allegations involve the defendants' activities in connection with the registration and attempted sale of the Internet website "efinancia.com." All defendants except Parsons filed motions to dismiss for failure to state a claim. Dotster, DeCarlo, and Vincent (the Dotster defendants) also filed a motion to dismiss for lack of personal jurisdiction. After determining that it lacked personal jurisdiction over the Dotster defendants and that Bird had failed to state a claim against either Afternic or the Dotster defendants, the district court granted the motions to dismiss filed by these defendants. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Internet domain names

This case involves the process of establishing domain names for Internet websites. Several introductory remarks are necessary to clarify the terms and actors that are relevant to

the process. A more detailed explanation of these concepts can be found in cases such as *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 981-82 (9th Cir. 1999), *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 871-72 (9th Cir. 1999), and *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 951-53 (C.D. Cal. 1997).

The creation of an Internet website requires the reservation of a location, called an Internet Protocol (IP) address, and the computer programming necessary to generate the contents of the site. In order to make using the Internet easier, specific "domain names" are assigned to correspond to the IP addresses. A person who wants to select a domain name must register the name with one of several domain-name registrars. These registrars screen the domain-name applications to make sure that the desired name is not already being used. In addition, the registrar maintains a directory that links domain names with their corresponding IP addresses.

An Internet user who seeks to access a website enters the domain-name combination that corresponds to the IP address, and he or she is then routed electronically to the computer that hosts that address. Because not every person who establishes a website desires to host the site on his or her own computer, an industry of surrogate hosts has developed, where entities license space on their computers to website operators. A person can thus maintain a website without keeping his or her personal computer constantly connected to the Internet.

## B.  Factual background

Bird has operated a computer software business under the tradename Financia, Inc. since 1983. In November of 1984, Bird obtained formal registration for the tradename "Financia" from the United States Patent and Trademark Office. He later registered a copyright for a manual and computer source code titled "Financia" in February of 1995. Financia, Inc. owns the Internet domain name financia.com. Bird alleges that as a result of the widespread distribution of his computer software program throughout North America since 1983, and the publication of several national articles

about his program, his "unique, suggestive, [and] fanciful" trademark is famous.

Dotster is a registrar of Internet domain names. It operates an Internet website at www.dotster.com, where individuals and corporations can register an alphanumeric string of characters as an Internet domain name. This registration process operates in conjunction with the Domain Registration of Internet Assigned Names and Numbers (IANN), which is maintained by Network Solutions, Inc. and regulated by the Internet Corporation for Assigned Names and Numbers (ICANN). Dotster is an ICANN-accredited registrar. In addition to acting as a registrar, Dotster allows registrants to "park" their domain names on its "Futurehome page." This service is useful for registrants who lack an Internet server to which the new domain name can be assigned.

Parsons registered the Internet domain name "efinancia.com" by using Dotster's website on February 10, 2000. He then decided to "park" his domain name on Dotster's "Futurehome page" with the address www.efinancia.com. Bird alleges that DeCarlo and Vincent, as either agents or principals of Dotster, took an active role in activating Parson's website and in advertising the site as available for use.

Afternic is a company that provides an auction service on its website, www.afternic.com, for the purchase, sale, and exchange of domain names. It listed efinancia.com on its website on February 11, 2000, the day after Parsons registered the domain name. The description of the domain name stated that efinancia means "eFinance in Spanish." In addition, the posting listed "fundwizard," a name that Bird contends identifies Parsons, as the domain name's seller. Bird alleges that the existence of the auction posting for efinancia.com "suggests a RICO type of mutually conspired pattern of conduct."

another language suggests a lack of originality and creativity. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985) ("The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality.").

We therefore conclude that Bird has failed to state a claim of copyright infringement against either Afternic or the Dotster defendants. The district court thus did not err in dismissing Bird's copyright infringement claim.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

For these reasons, we conclude that Bird has failed to state a claim under the ACPA against either Afternic or the Dotster defendants. The district court therefore did not err in dismissing Bird's ACPA claim against these defendants.

**E.   Alleged violations of federal copyright law**

Both Afternic and the Dotster defendants argue that Bird failed to state a claim of copyright infringement because a copyright ordinarily does not subsist in a single word. Courts that have addressed this issue have concluded that taking a single word, or even a phrase, from a copyrighted work generally does not violate the rights that copyright law provides to the owner of that work. *CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1519-20 (1st Cir. 1996) ("It is axiomatic that copyright law denies protection to fragmentary words and phrases and to forms of expression dictated solely a[s] functional considerations on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection.") (internal quotation marks and citation omitted); *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1072-73 (2d Cir. 1992) (holding that the single words that the defendant copied did "not exhibit the minimal creativity required for copyright protection").

In *Arica Institute*, the Court of Appeals for the Second Circuit explained that a defendant's copying of a word or phrase is actionable under copyright law only if the defendant "has also appropriated enough of plaintiff's sequence of thoughts, choice of words, emphasis, and arrangement to satisfy the minimal threshold of required creativity." 970 F.2d at 1073 (internal quotation marks and citation omitted). The defendants' alleged use of the word "efinancia" simply does not reproduce any of the creativity that entitles Bird to a copyright in the computer program titled Financia.

Bird's contention that the word "financia" is not found in any dictionary, but instead "developed as a noun in Late Latin from a Middle-German root word" does not alter this conclusion. In fact, his claim that the word derives from

**C.   Procedural background**

This lawsuit was filed in the United States District Court for the Southern District of Ohio on May 31, 2000. Bird's complaint alleges trademark infringement, unfair competition, and trademark dilution, in violation of 15 U.S.C. §§ 1114(1)(a), 1125(a), and 1125(c), respectively. In addition, Bird asserts a claim for "cybersquatting" under the Anticybersquatting Consumer Protection Act of 1999 (ACPA), 15 U.S.C. § 1125(d), as well as for copyright infringement in violation of 17 U.S.C. § 106.

On September 8, 2000, Afternic filed a motion to dismiss Bird's allegations against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Dotster defendants followed suit on September 20, 2000 with a motion to dismiss for lack of personal jurisdiction and for failure to state a claim, pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, respectively.

All parties consented to having the case decided by a magistrate judge pursuant to 28 U.S.C. § 636(c). The magistrate judge concluded that the district court lacked personal jurisdiction over the Dotster defendants and that Bird had failed to state a claim against either Afternic or the Dotster defendants. As a result, the district court granted the motions to dismiss filed by these defendants in an order that was entered on November 27, 2000.

The district court recognized that its order did not resolve Bird's allegations against Parsons, but it nonetheless directed that its judgment of dismissal as to Afternic and the Dotster defendants be final pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. According to the court, no just cause existed to delay the entry of final judgment as to these defendants because Parsons was proceeding pro se and the litigation between Bird and Parsons "may be more protracted." A final judgment was therefore entered on November 27, 2000. This timely appeal followed.

## II. ANALYSIS

### A.  Standards of review

We review de novo a district court's dismissal of a complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887-88 (6th Cir. 2002). The party seeking to assert personal jurisdiction bears the burden of demonstrating that such jurisdiction exists. *Id.* at 887. When the district court dismisses a complaint pursuant to Rule 12(b)(2) without conducting an evidentiary hearing on the issue of personal jurisdiction, however, the plaintiff "need only make a prima facie showing of jurisdiction." *Id*. (citation omitted). In this situation, we "will not consider facts proffered by the defendant that conflict with those offered by the plaintiff, and will construe the facts in a light most favorable to the nonmoving party." *Id*.

A district court's dismissal of a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is also reviewed de novo. *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999). In considering a motion to dismiss, "[t]he court must construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true." *Id.* (citation omitted). "A motion to dismiss under Rule 12(b)(6) should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Buchanan v. Apfel*, 249 F.3d 485, 488 (6th Cir. 2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *see also Jackson*, 194 F.3d at 745 (noting that dismissal is only proper "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations") (citation omitted).

### B.  Personal jurisdiction over the Dotster defendants

Where a federal court's subject matter jurisdiction over a case stems from the existence of a federal question, personal

---

relate to these defendants' intent. First, Bird alleges that after Parsons registered the domain name efinancia.com, DeCarlo and Vincent "promptly posted a working website at http://www.efinancia.com advertising the site as available for use, obviously to the highest bidder, and using the site in a commercial manner to solicit business for their registrar entity." Second, after noting that Afternic had a listing for efinancia.com on its auction site, Bird contends that the defendants' actions "suggest[] a RICO type of mutually conspired pattern of conduct."

These allegations, however, are insufficient to state a claim of cybersquatting against Afternic or the Dotster defendants. Although the defendants' motions to dismiss focus on the lack of allegations indicating any bad faith on their part, a more fundamental and indeed fatal flaw exists in Bird's claim of cybersquatting against these defendants. Specifically, Bird must establish that the defendants registered, trafficked in, or used a domain name in order to state a claim for a violation of the ACPA. The only defendant that *registered* a domain name is Parsons, and liability for *using* a domain name can only exist for the registrant or that person's authorized licensee. 15 U.S.C. § 1125(d)(1)(D). Bird's complaint contains no allegation that any of the other defendants are Parsons's licensee.

Moreover, with regard to potential liability under the ACPA for *trafficking in* domain names, neither Afternic nor the Dotster defendants trafficked in the domain name efinancia.com. They did not purchase, sell, or otherwise participate in any transaction involving the "transfer for consideration" or "receipt in exchange for consideration" of Parsons's domain name. 15 U.S.C. § 1125(d)(1)(E). Dotster's fees stem from its registering the domain name and allowing registrants to host their web page on its "Futurehome page." Afternic provides a virtual auction site, but the fact that its services might be used for trafficking in a domain name does not render it liable for trafficking.

the trademark. *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 493 (2d Cir. 2000) ("Cybersquatting involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners.").

The ACPA provides in pertinent part as follows:

A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person (i) has a bad faith intent to profit from that mark . . . and (ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark . . . .

15 U.S.C. § 1125(d)(1)(A). With regard to a person's "bad faith intent," the ACPA enumerates nine nonexclusive factors that are relevant to this element of a claim. 15 U.S.C. § 1125(d)(1)(B). The ACPA also provides that liability for "using" a domain name arises "only if [a] person is the domain name registrant or that registrant's authorized licensee." 15 U.S.C. § 1125(d)(1)(D). Equally important, "the term 'traffics in' refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration." 15 U.S.C. § 1125(d)(1)(E).

Both Afternic and the Dotster defendants argue that Bird failed to state a claim under the ACPA against them because his complaint contains no factual allegations that would support a finding that they had a "bad faith intent to profit" by registering the domain name "efinancia.com" or by providing an auction site where Parsons attempted to sell that domain name. Only two factual allegations in the complaint arguably

jurisdiction over a defendant exists "if the defendant is amenable to service of process under the [forum] state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant[] due process." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992) (internal citations omitted). We have recognized that Ohio's long-arm statute is not coterminous with federal constitutional limits. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000) (noting that "the Ohio Supreme Court has ruled that the Ohio long-arm statute does not extend to the constitutional limits of the Due Process Clause") (citing *Goldstein v. Christiansen*, 638 N.E.2d 541, 545 n.1 (Ohio 1994) (per curiam)). Nevertheless, in evaluating whether personal jurisdiction is proper under Ohio's long-arm statute, we have consistently focused on whether there are sufficient minimum contacts between the nonresident defendant and the forum state so as not to offend "traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998) (addressing the due process concerns rather than inquiring into the propriety of jurisdiction under Ohio's long-arm statute).

Bird appears to believe that the language in the various statutes that he alleges the defendants violated confers personal jurisdiction over the Dotster defendants, regardless of their contacts with Ohio. This belief is erroneous. As explained above, the relevant inquiry requires an analysis of the defendants' contacts with the forum state. Moreover, Bird's complaint does not include any facts that support the exercise of personal jurisdiction over the Dotster defendants.

The only factual allegations that connect these defendants in any way to Ohio appear in Bird's response to the Dotster defendants' motion to dismiss and in his appellate brief. After recognizing that the Dotster defendants are all residents of the state of Washington, Bird uses the Dotster defendants' admission that they have sold about 333,333 Internet domain-name registrations to estimate the number of sales that have

occurred in Ohio. According to Bird, 70% of the Dotster defendants' sales occurred in the United States. He then divides this number equally among the 50 states, which leads him to the conclusion that 4,666 of these transactions involved an Ohio resident.

Although this reasoning lacks any direct factual support, we must draw all permissible inferences in favor of Bird at this stage of the proceedings, because no evidentiary hearing or discovery has occurred. *Compuserve, Inc. v. Patterson*, 89 F.3d 1257, 1261-62 (6th Cir. 1996) (noting that in reviewing a district court's dismissal of a complaint for lack of personal jurisdiction without conducting an evidentiary hearing or allowing discovery, this court must "consider the pleadings and affidavits in a light most favorable to the plaintiff"). We are therefore faced with the question of whether Bird's allegation that 4,666 Ohio residents have registered domain names with Dotster, as well as the presence of Dotster's website on the Internet, constitutes sufficient "minimum contacts" with Ohio such that the exercise of jurisdiction over the Dotster defendants does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316.

Although it is tempting to avoid addressing Bird's novel theory of personal jurisdiction by assuming, without deciding, that the Dotster defendants are subject to personal jurisdiction in Ohio, and proceed directly to the substantive claims that Bird asserts, the Supreme Court has recently foreclosed this possibility. *Steel Co. v. Citizens for a Better Env't*, 523, U.S. 83, 93-95 (1998) (rejecting the approach of assuming jurisdiction for the purpose of deciding the merits because "[t]he requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception") (internal quotation marks and brackets omitted); *see Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999) (explaining that "no unyielding jurisdictional hierarchy" exists between subject matter and personal jurisdiction); *see also In re Rationis Enters., Inc. of Panama*,

that would support such a theory. In fact, the complaint does not allege that Afternic's profits vary according to the ultimate selling price of the domain names that are auctioned on its site.

Individuals who use Afternic's auction site, moreover, can buy and sell domain names that contain registered trademarks without engaging in the commercial use of those marks. *Compare Avery Dennison Corp.*, 189 F.3d at 880 (holding that the defendants did not make commercial use of the plaintiffs' registered trademarks because they "[did] not use trademarks qua trademarks," but instead "use[d] words that happen to be trademarks for their non-trademark value") *with Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1325 (9th Cir. 1998) (concluding that where the defendant's "business is to register trademarks as domain names and then sell them to the rightful trademark owners," he engaged in the commercial use of the plaintiff's registered trademark). Simply posting a domain name on an Internet auction site, therefore, is insufficient to establish the commercial use of a trademark. This reasoning also applies to an entity, such as Afternic, that operates an online auction site. We therefore conclude that Bird has failed to state a claim of trademark dilution against Afternic.

For all of these reasons, the district court did not err in dismissing Bird's dilution claims against Afternic and the Dotster defendants.

### D.  Alleged violations of the ACPA

The ACPA was enacted in 1999 to address "a new form of piracy on the Internet caused by acts of 'cybersquatting,' which refers to the deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners." S. Rep. No. 106-140, at 4 (1999). In the typical situation that the ACPA seeks to address, individuals register domain names that consist of famous trademarks and then attempt to sell (or perhaps more accurately, to ransom) those domain names to the trademark owners, thereby profiting from the goodwill associated with

### 2. Trademark dilution

Trademark dilution laws protect "famous marks" from being weakened by the unauthorized use of another mark. 15 U.S.C. § 1127 (defining "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods and services . . ."). One of the elements of a claim of dilution is that the alleged diluter, the junior user, engage in "the commercial use in commerce" of the diluting trademark. *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 577 (6th Cir. 2000) (noting that "the junior use must be a commercial use in commerce") (citation omitted); 15 U.S.C. § 1125(c) ("The owner of a famous mark shall be entitled . . . to an injunction against another person's commercial use in commerce of a mark or trade name . . . ."). Commercial use occurs where the alleged diluter uses "the trademark as a trademark, capitalizing on its trademark status." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 880 (9th Cir. 1999).

In *Lockheed Martin Corp.*, the district court held that "acceptance of domain name registrations is not a 'commercial use' within the meaning of [15 U.S.C. § 1125(c)]." 985 F. Supp. at 959. The court reasoned that even though a registrar sells domain names, and thereby profits from the names that registrants choose, it "does not trade on the value of domain names as trademarks." *Id.* at 960 ("NSI's use of domain names is connected to the names' technical function on the Internet to designate computer addresses, not to the names' trademark function to distinguish goods and services."). We find this analysis persuasive. As a result, we conclude that Bird has failed to state a claim of trademark dilution against the Dotster defendants.

Bird's claim of dilution against Afternic presents a closer question. It is entirely possible that the value of a domain name that is listed on Afternic's online auction site will be significantly greater if the name resembles an established trademark. In this sense, Afternic might be able to capitalize on and profit from a domain name being a trademark. Bird's complaint, however, does not include any factual allegations

261 F.3d 264, 267-68 (2d Cir. 2001) (noting that consideration of the defendant's claim that the district court lacked personal jurisdiction over it had to occur before an analysis of the merits of the case); *In re Papandreou*, 139 F.3d 247, 255-56 (D.C. Cir. 1998) (recognizing that personal jurisdiction is a threshold question that must precede the merits). We must therefore decide whether personal jurisdiction exists over the Dotster defendants before proceeding to the merits of the case.

Personal jurisdiction can be either general or specific, depending upon the nature of the contacts that the defendant has with the forum state. *Conti v. Pneumatic Prods. Corp.*, 977 F.2d 978, 981 (6th Cir. 1992) (noting that a distinction between general and specific jurisdiction exists for the purpose of the due process analysis). Because Bird does not indicate whether he contends that the Dotster defendants are subject to general or specific jurisdiction, we analyze both possibilities. Our discussion focuses on the only contacts that Bird has alleged—the registrations that Dotster has presumably undertaken for Ohio residents and the existence of Dotster's website on the Internet.

General jurisdiction is proper only where "a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." *Third Natl. Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989) (internal quotation marks omitted). In *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984), the Supreme Court held that the contacts between the nonresident defendant, Helicol, and Texas were insufficient to support the exercise of general jurisdiction. *Id.* at 416. After noting that Helicol lacked a place of business and had never been licensed to do business in Texas, the Court identified four types of contacts between Helicol and Texas: "sending its chief executive officer to Houston for a contract-negotiating session; accepting into its New York bank account checks drawn on a Houston bank; purchasing

helicopters, equipment, and training services from Bell Helicopter [located in Fort Worth] for substantial sums; and sending personnel to Bell's facilities in Fort Worth for training." *Id*. The Court explained that the first contact was a one-time event, and the second was "of negligible significance." *Id*. Regarding the latter two contacts, the Court held that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions. Nor can we conclude that the fact that Helicol sent personnel into Texas for training in connection with the purchase of helicopters and equipment in that State in any way enhanced the nature of Helicol's contacts with Texas." *Id*. at 418.

These contacts, the Court noted, differed markedly from those that were sufficient to support the exercise of general jurisdiction in *Perkins v. Benguet Consolidated Mining Company*, 342 U.S. 437 (1952). *Helicopteros Nacionales de Colombia*, 466 U.S. at 415-16. In *Perkins*, the president of a nonresident defendant corporation had maintained an office in Ohio where he kept company files and held meetings. Equally important, the president also "carried on correspondence relating to the business, distributed salary checks drawn on two active Ohio bank accounts, engaged an Ohio bank to act as transfer agent, and supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines." *Id*. at 415.

The Court's analysis in *Helicopteros Nacionales de Colombia* is directly applicable to the present case. Bird has not alleged that Dotster has an office in Ohio, is licensed to do business there, has an Ohio bank account, or directs its business operations from Ohio. Nor does Bird claim that any of the Dotster defendants have ever visited Ohio. Moreover, the allegation that 4,666 Ohio residents registered domain names with Dotster fails to establish that Dotster has a "continuous and systematic" presence in Ohio. These registrations are similar to the purchases that were held

telephone number is used if the alleged infringer makes no attempt to promote its number. *Holiday Inns, Inc.*, 86 F.3d at 625-26 (holding that "although Holiday Inns owns trademark rights in its vanity number 1-800-HOLIDAY," the defendants did not violate those rights by using a telephone number that corresponded to 1-800-H[zero]LIDAY).

Like domain names, telephone numbers can be used not only for the purpose of identification, in which case infringement might occur, but also to direct a telephone signal to the proper endpoint. A registrar that grants a particular domain name to a registrant simply grants it an address. In this sense, the registrar, which resembles a telephone company that assigns a telephone number, is one step removed from the defendants in *Holiday Inns, Inc*. The fact that the registrant can then use its domain name to infringe on the rights of a registered trademark owner does not subject the registrar to liability for trademark infringement or unfair competition.

Similar reasoning applies to Afternic, which, according to Bird's complaint, functions as an auction site for domain names on the Internet. The possibility that its customers might buy or sell infringing domain names does not alter the fact that Afternic does not use those names. Moreover, even a domain name that could be used to violate a registered trademark does not necessarily do so. *Juno Online Servs., L.P. v. Juno Lighting, Inc.*, 979 F. Supp. 684, 690-92 (N.D. Ill. 1997) (dismissing the unfair competition claim brought against a lighting company that registered the domain name "juno-online.com," because the plaintiff did not allege that the defendant took any actions other than registering the name).

For all of these reasons, we conclude that Bird has failed to state a claim of infringement or of unfair competition against either Afternic or the Dotster defendants. The district court thus did not err in dismissing Bird's infringement and unfair competition claims against these defendants.

the Academy failed to establish the likelihood of success on the merits necessary to secure a preliminary injunction where it alleged that the defendant registered domain names that infringed on the Academy's trademarks, because the defendant did not engage in the commercial use of the Academy's registered marks as required under §§ 1114(1)(a) and 1125(a)(1)); *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 956-59 (C.D. Cal. 1997) (reaching the same conclusion on a motion for summary judgment in a case with nearly identical facts, explaining that "something more than the registration of the name is required before the use of a domain name is infringing"), *aff'd*, 194 F.3d 980 (9th Cir. 1999).

In *Lockheed Martin Corp.*, the district court noted that "[d]omain names present a special problem under the Lanham Act because they are used for both a non-trademark technical purpose, to designate a set of computers on the Internet, and for trademark purposes, to identify an Internet user who offers goods or services on the Internet. When a domain name is used only to indicate an address on the Internet, the domain name is not functioning as a trademark." *Lockheed Martin Corp.*, 985 F. Supp. at 956 (internal citation omitted). The court proceeded to explain that by accepting domain-name registrations, Network Solutions, Inc. (NSI) was "not using the [registered trademark] in connection with the sale, distribution or advertising of goods and services. NSI merely uses domain names to designate host computers on the Internet. This is the type of purely nominative function that is not prohibited by trademark law." *Id*. at 957 (internal quotation marks and citation omitted). We agree with this analysis.

Moreover, as the *Lockheed Martin Corp.* court noted, a useful analogy exists between domain names and vanity telephone numbers. *Id*. at 957-58. These toll-free telephone numbers consist of easy to remember words, where each letter represents a number on the telephone keypad. Vanity numbers are entitled to protection under the Lanham Act, but infringement does not occur where a confusingly similar

insufficient to establish general jurisdiction in *Helicopteros Nacionales de Colombia*.

Furthermore, the fact that Dotster maintains a website that is accessible to anyone over the Internet is insufficient to justify general jurisdiction. *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419-20 (9th Cir. 1997) (holding that the maintenance of a passive website that contained advertisements did not even justify the exercise of *specific* jurisdiction over the defendant, whom the plaintiff conceded was not subject to general jurisdiction). The ability of viewers to register domain names on the website does not alter our conclusion, because the website, in this respect, simply enables Dotster to do business with Ohio residents, a fact that does not permit general jurisdiction. *See Bancroft & Masters, Inc. v. Augusta Natl. Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) (explaining that "engaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders"). We also find it significant that, unlike direct marketing, registrants initiate the contact with Dotster. *Cf. Mich. Natl. Bank v. Quality Dinette, Inc.*, 888 F.2d 462, 466 (6th Cir. 1989) (holding that the exercise of general jurisdiction was proper where the defendants retained an independent sales representative in Michigan, conducted mail order solicitations of Michigan businesses, "made over 400 sales totaling over $625,000 in 1986 and 1987," and "made at least one sale in Michigan each and every month during 1986 and 1987").

For these reasons, the Dotster defendants are not subject to general jurisdiction in Ohio. We must therefore determine whether they are subject to specific jurisdiction, which occurs where "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia,* 466 U.S. at 414 n.8.

Specific jurisdiction over the Dotster defendants is permissible only if their contacts with Ohio satisfy the three-

part test that this court established in *Southern Machine Company v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968):

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*See Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721-24 (6th Cir. 2000) (applying the *Mohasco* factors).

The operation of an Internet website can constitute the purposeful availment of the privilege of acting in a forum state under the first *Mohasco* factor "if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir. 2002). We conclude that by maintaining a website on which Ohio residents can register domain names and by allegedly accepting the business of 4,666 Ohio residents, the Dotster defendants have satisfied the purposeful-availment requirement. *Id.* (holding that the defendant purposefully availed itself of the privilege of doing business in Michigan by granting its clients passwords to access its services on the website and by welcoming the business of Michigan customers on a regular basis). Although it is unclear whether registrants who use Dotster's website do so on a repeated basis, the proffered evidence that Dotster regularly chooses to do business with Ohio residents is sufficient to constitute purposeful availment. *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1126-27 (W.D. Pa. 1997) (holding that the defendant's decision to conduct business via the Internet with Pennsylvania residents constituted purposeful availment, noting that the fact that residents initiated the

offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . ." 15 U.S.C. § 1114(1)(a). Similarly, a person engages in unfair competition if he or she, "on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" in a manner that is "likely to cause confusion . . . ." 15 U.S.C. § 1125(a)(1)(A).

As these statutes indicate, a claim of unfair competition, unlike a claim of trademark infringement, does not require that a defendant use the plaintiff's trademark. Bird's allegations, however, relate to the defendants' alleged use of his trademark, rather than any other actions that might have misled the public. In the present case, therefore, Bird's claims of trademark infringement and unfair competition fail unless the defendants actually used Bird's trademark in a prohibited manner. *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 626 (6th Cir. 1996) (explaining that the likelihood-of-confusion analysis is not necessary in the absence of the defendant's use of a protected mark, of some deceptively similar variant of that mark, or of a false or misleading representation).

This court has not had the occasion to address whether companies that operate as Internet domain-name registrars or that provide an Internet auction site for registered domain names, which Dotster and Alternic respectively do, can be liable for infringement or unfair competition if a third party registers and seeks to sell a domain name that allegedly violates the rights of a trademark owner. Two decisions from the United States District Court for the Central District of California, however, have concluded that domain-name registrars do not "use" trademarks for the purpose of §§ 1114(1)(a) and 1125(a)(1) in such a situation. *Academy of Motion Picture Arts & Sciences v. Network Solutions, Inc.*, 989 F. Supp. 1276, 1280-81 (C.D. Cal. 1997) (holding that

personal jurisdiction over these defendants, subjecting them to personal jurisdiction in Ohio does not violate the Due Process Clause. Both prerequisites for the exercise of personal jurisdiction over the Dotster defendants are therefore satisfied. As a result, we conclude that the district court erred in granting the Dotster defendants' motion to dismiss for lack of personal jurisdiction.

**C. Allegations of trademark infringement, unfair competition, and trademark dilution**

Turning now to the merits of Bird's substantive claims, both Afternic and the Dotster defendants argue that because they did not "use" Bird's trademark, they cannot be liable for either trademark infringement or unfair competition. They also contend that Bird cannot state a claim for trademark dilution against them because they did not engage in the "commercial use in commerce" of Bird's trademark.

*1.    Trademark infringement and unfair competition*

Generally speaking, the key question in cases where a plaintiff alleges trademark infringement and unfair competition is whether the defendant's actions create a likelihood of confusion as to the origin of the parties' goods or services. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) ("The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."); *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116, 1123 (6th Cir. 1996) (explaining that the central inquiry in claims of trademark infringement and unfair competition is whether the defendant's use of the plaintiff's mark is likely to cause confusion).

Trademark infringement, for example, occurs if a person, acting without the permission of a trademark's owner, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale,

business relationships after visiting the defendant's website did not make the contacts fortuitous).

The second requirement under *Mohasco* involves an analysis of whether Bird's claims "arise from" the Dotster defendants' contacts with Ohio. "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contracts." *Compuserve, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996). This factor "does not require that the cause of action formally 'arise from' defendant's contacts with the forum; rather, this criterion requires only 'that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities.'" *Third Natl. Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989) (quoting *Mohasco*, 401 F.2d at 384 n.27).

The operative facts in the present case include Bird's allegation that the Dotster defendants committed copyright and trademark law violations by registering Parsons's domain name efinancia.com. Both the Dotster defendants' contacts with Ohio and Bird's claim of copyright and trademark violations stem from these defendants' operation of the Dotster website. As a result, the operative facts are at least marginally related to the alleged contacts between the Dotster defendants and Ohio. In light of the lenient standard that applies when evaluating the "arising from" criterion, we conclude that Bird's claims "arise from" the Dotster defendants' contacts with Ohio. *See Zippo Mfg. Co.*, 952 F. Supp. at 1127 (holding that a significant amount of the alleged infringement and dilution, as well as the resulting injury, occurred in Pennsylvania).

The final requirement under *Mohasco* is that the exercise of jurisdiction be reasonable in light of the connection that allegedly exists between the Dotster defendants and Ohio. An inference arises that the third factor is satisfied if the first two requirements are met. *Compuserve, Inc.*, 89 F.3d at 1268 (noting that "if we find, as we do, the first two elements of a

prima facie case—purposeful availment and a cause of action arising from the defendant's contacts with the forum state—then an inference arises that this third factor is also present"). Several factors are relevant to the reasonableness inquiry, "including the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies." *Id.* (internal quotation marks and citation omitted).

Although the Dotster defendants might face a burden in having to defend a lawsuit in Ohio, they cannot reasonably object to this burden given that Dotster has allegedly transacted business with 4,666 Ohio residents. Ohio has a legitimate interest in protecting the business interests of its citizens, even though all of Bird's claims involve federal law. Bird has an obvious interest in obtaining relief, and Ohio might be the only forum where jurisdiction would exist over all of the defendants. Although the state of Washington also has an interest in this dispute, because the claim involves its citizens, this interest does not override the other factors suggesting that personal jurisdiction in Ohio is reasonable.

For all of the preceding reasons, we conclude that Bird has established a prima facie case that the Dotster defendants are subject to specific jurisdiction in Ohio. The sole remaining question is whether jurisdiction is authorized pursuant to Ohio's long-arm statute, an inquiry that we deferred considering above. Pursuant to both Ohio's long-arm statute and its Civil Rule regarding service of process, courts may exercise personal jurisdiction over a defendant whose actions cause "tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state." Ohio Rev. Code § 2307.382(A)(4); Ohio R. Civ. P. 4.3(A)(4); *Estate of Poole v. Grosser*, 731 N.E.2d 226, 229 (Ohio Ct. App. 1999) (explaining that both the long-arm statute and the Civil Rule "require a finding that (1) an act or omission outside the state caused tortious injury

in Ohio, and (2) the defendant regularly conducted activity in Ohio").

Bird's allegations support a finding that the Dotster defendants "regularly conducted activity in Ohio." The Dotster defendants' acts also allegedly "caused tortious injury in Ohio," because violations of federal trademark law are analogous to tort cases. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) (recognizing that the plaintiff's allegation that the defendant engaged in trademark infringement, trademark dilution, and unfair competition by intentionally registering the plaintiff's registered trademarks as his domain names was "akin to a tort case"); *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club, Ltd. P'ship*, 34 F.3d 410, 411-12 (7th Cir. 1994) (holding that personal jurisdiction was appropriate in Indiana because trademark infringement resembles a tort claim, and a substantial amount of the injury to the plaintiff was likely to occur in Indiana); *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1388 (8th Cir. 1991) (explaining that "[i]nfringement of a trademark is a tort").

Moreover, because a plaintiff whose trademark has been violated potentially suffers economic harm as a result of the defendant's actions, the injury occurs both in places where the plaintiff does business and in the state where its primary office is located. *Panavision Int'l, L.P.*, 141 F.3d at 1322 (noting that the defendants's trademark violations "had the effect of injuring Panavision in California where Panavision has its principal place of business and where the movie and television industry is centered"); *Zippo Mfg. Co.*, 952 F. Supp. at 1127 (concluding that because the plaintiff was a Pennsylvania corporation, "a substantial amount of the injury from the alleged wrongdoing is likely to occur in Pennsylvania").

For these reasons, we conclude that Ohio's long-arm statute authorizes personal jurisdiction over the Dotster defendants. Our previous discussion also demonstrates that because Bird has established a prima facie case for the exercise of specific