NOT FOR PUBLICATION
File Name: 05a0661n.06
Filed: August 4, 2005

No. 04-3569

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

THE SCOTTS COMPANY,

  Plaintiff-Appellant,

v.

AVENTIS S.A.; STARLINK
LOGISTICS, INC.,

  Defendants-Appellees.

_____/

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

BEFORE:  SUHRHEINRICH and GILMAN, Circuit Judges; and ACKERMAN,[*] District Judge.

  **SUHRHEINRICH, J.**  Plaintiff-Appellant, the Scotts Company ("Scotts") appeals from the order of the district court granting Defendants-Appellees' (collectively, "Defendants") motion to dismiss for lack of personal jurisdiction in this diversity action.  For the reasons that follow, we **REVERSE** the judgment of the district court.

### I. Background

  Scotts, an Ohio corporation with its principal place of business in Ohio, produces and markets products for consumer lawn and garden, for professional turf care, and for horticulture. Defendant Aventis S.A. ("Aventis") is a French corporation with its principal place of business in

_____

[*]The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

Schiltigheim, France. Defendant StarLink Logistics, Inc. ("StarLink") is a wholly-owned subsidiary of Aventis, incorporated in Delaware, with its principal place of business in Morrisville, North Carolina.

The facts that follow outline Defendants' connections to a contract negotiated and executed in Ohio. On September 30, 1998, Scotts and several of its subsidiaries entered into a contract (the "Master Contract") with Rhone-Poulenc Agro, a French company and wholly-owned subsidiary of Rhone-Poulenc S.A., whereby the Scotts entities purchased the lawn and garden business of Rhone-Poulenc Agro. Representatives of both Rhone-Poulenc Agro and Rhone-Poulenc S.A. negotiated and executed the Master Contract in Ohio.

The parties agreed that Rhone-Poulenc Agro would refrain from competing with Scotts in the lawn and garden business for a designated period. The Master Contract also required Rhone-Poulenc Agro to offer to sell Scotts any controlling interest it acquired in a consumer plant care and household insecticide company within three months from the date on which it acquired the interest.

In December of 1999, Rhone-Poulenc S.A. merged with a German company, Hoechst A.G., to form Aventis. As part of this transaction, Rhone-Poulenc Agro and AgrEvo, the operating subsidiaries of Rhone-Poulenc S.A. and Hoechst A.G. respectively, merged to form Aventis CropScience ("ACS"). As a result, ACS became the successor-in-interest to Rhone-Poulenc Agro, and thus became liable for the obligations under the agreement with Scotts.

On approximately January 1, 1999, ACS acquired a controlling interest (60%) in TechPac, L.L.C. ("TechPac"), a company engaged in the production of lawn-care products and household insecticides, allegedly without disclosing the acquisition to Scotts within the three-month period

2

designated by the Master Contract. In October of 2000, after independently learning of the acquisition, Scotts informed ACS that it wished to enforce the option clause. ACS responded by indicating that it would sell its interest in TechPac to Scotts at a "bona fide arm's length price" as required under the Master Contract. ACS sent a written offer to Scotts, directing its correspondence to Scotts' legal counsel in California. Scotts alleges that after performing limited due diligence, Scotts decided the offer was a sham because it did not represent the fair market value of TechPac, and further concluded that Aventis had instructed ACS to make a bad faith offer in order to maliciously interfere with Scotts' contractual rights.

In April of 2001, ACS initiated an auction of TechPac. Scotts made an offer, which it claims was reasonable, but ACS rejected it. Scotts alleges that Aventis directed ACS not to make a counter proposal and to withhold from Scotts any information as to other bids. Thereafter, Aventis sold ACS to Bayer, an international chemical and healthcare company based in Germany, and ACS became Bayer CropScience. Consequently, Bayer CropScience became the successor-in-interest to the Master Contract with Scotts. Before the sale to Bayer was complete, however, Aventis transferred ACS's controlling interest in TechPac to one of its other wholly-owned subsidiaries, StarLink. StarLink is the other defendant to this action, and it currently holds the TechPac interest that is the subject of the present action.

Scotts claims that it has a contractual right, now running to Bayer CropScience as the successor-in-interest to the Master Contract with Scotts, to purchase TechPac for fair market value. Yet, according to Scotts, it was unable to enforce this contractual right, and Bayer CropScience was unable to perform its assumed obligation, because Aventis transferred the TechPac interest to StarLink, an entity with which Scotts has no contractual relationship. Thus, Scotts has brought this

3

action against Aventis and StarLink for equitable restitution and tortious interference with contract.

Both StarLink and Aventis filed motions to dismiss for lack of personal jurisdiction. *See* FED. R. CIV. P. 12(b)(2). The magistrate judge issued a report and recommendation concluding that the court lacked personal jurisdiction over either defendant. Specifically, the magistrate judge determined that Scotts had failed to demonstrate a prima facie case of jurisdiction under Ohio's long-arm statute. In the alternative, assuming jurisdiction existed under Ohio's long-arm statute, the magistrate judge ruled that the exercise of personal jurisdiction over Starlink and Aventis would not comply with due process requirements.

Scotts filed objections to the magistrate judge's report and recommendation. The district court held that, although Scotts established a prima facie case that Defendants had tortiously interfered with the contract, Scotts failed to establish a prima facie case that the court could exercise specific or general jurisdiction over Defendants. Thus, the case was dismissed.

Scotts appeals.

## II. Standard of Review

This Court reviews de novo the district court's decision to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). *See Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd.*, 91 F.3d 790, 793 (6th Cir. 1996). The plaintiff bears the burden of establishing the existence of personal jurisdiction. *See Int'l Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997). If the district court does not conduct an evidentiary hearing on the matter of personal jurisdiction, the plaintiff must make only a prima facie showing of jurisdiction. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). That is, the plaintiff must "'demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss.'" *Welsh v. Gibbs*,

4

631 F.2d 436, 438 (6th Cir. 1980) (quoting *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 (9th Cir. 1977)). This Court must view the pleadings and other evidence in a light most favorable to Scotts without considering Defendants' controverting assertions. *See Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 478 (6th Cir. 2003).

### III. Analysis

Scotts argues that the district court erred in holding that the exercise of specific personal jurisdiction over Aventis and StarLink would violate due process. Scotts also argues that the district court erred in holding that it could not exercise general personal jurisdiction over Aventis and StarLink.

A federal court sitting in a diversity matter must look to the law of the forum state to determine the extent of its in personam jurisdiction. *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 224 (6th Cir. 1972) (citing *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 376 n.2 (6th Cir. 1968)). Ohio law therefore governs whether this Court may exercise personal jurisdiction over StarLink and Aventis.

Where the plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum, the court is said to exercise specific jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). The exercise of specific jurisdiction must comply with both the state long-arm statute and constitutional due process. *See Tryg Int'l*, 91 F.3d at 793.

The parties do not dispute on appeal that Scotts' allegations satisfy Ohio's long-arm statute. *See* OHIO REV. CODE § 2307.382(A)(4) (providing for suit against a nonresident defendant arising from the nonresident's "[t]ransacting any business in this state"), (A)(6) ("[c]ausing tortious injury

5

in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state"). As the district court stated, "Scotts has alleged sufficient facts to establish a prima facie case that both Aventis and StarLink caused a tortious injury in Ohio with the purpose of injuring persons and with a reasonable expectation that some person in Ohio would be injured." Thus, the issue here is whether the exercise of specific jurisdiction under the long-arm statute satisfies due process.

In evaluating whether personal jurisdiction is constitutional under Ohio's long-arm statute, the test is whether there are sufficient minimum contacts between the nonresident defendant and the forum state so as not to offend "'traditional notions of fair play and substantial justice.'" *Bird v. Parsons*, 289 F.3d 865, 872 (6th Cir. 2002) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In this Circuit we employ a three-part test to define the outer limits of personal jurisdiction based on a single act, as set forth in *Southern Machine*, 401 F.2d at 381. First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. *Id.* Second, the cause of action must arise from the defendant's activities there. *Id.* Third, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Id.*

The district court held that it could not exercise specific jurisdiction because none of the defendants' contacts with Ohio related to the facts that led to the cause of action. Specifically, the district court held that the only contact that had any relation to the current dispute was the 1998 negotiation and execution of the Master Contract by Aventis' predecessor, Rhone-Poulenc S.A., and that the Master Contract was not the basis for the present tort cause of action. For the following

6

reasons, we disagree with this conclusion.

We begin with the first *Southern Machine* factor, purposeful availment. Scotts argues that the district court erred in not considering the "effects test" when evaluating this factor and thus considered only Defendants' acts in Ohio rather than the consequences of their acts. Under the effects test, first articulated in *Calder v. Jones*, 465 U.S. 783 (1984), personal jurisdiction exists where an individual purposefully directs activities towards the forum state with the intent to cause harm there.

In *Calder*, entertainer Shirley Jones brought an action in California against the author and editor of a *National Enquirer* article that she claimed was defamatory. Although the defendants were both residents of Florida and appeared to have few contacts with California, the Supreme Court held that jurisdiction over defendants was proper because California was "the focal point both of the story and of the harm suffered." *Calder*, 465 U.S. at 789. The Supreme Court concluded that because the defendants' intentional actions were aimed at California and the brunt of the harm would be felt there, the defendants could reasonably anticipate being haled into court in California. *Id.* at 789-90.

We applied the *Calder* effects test in *Reynolds v. International Amateur Athletic Federation*, 23 F.3d 1110, 1119-20 (6th Cir. 1990),[1] a case involving a defamation suit arising out of a press

---

[1]Although this Circuit has long held that the minimum contacts test can be satisfied either by acting *or* the causing of a consequence in the forum state, *see Southern Mach.*, 401 F.2d at 380, we have *not* held that merely causing a consequence *always* satisfies the minimum contacts test. *Compare with Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997) (holding that "there can be no serious doubt . . . that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor"). Rather, we have applied *Calder* narrowly by evaluating whether a defendant's contacts with the forum may be enhanced if the defendant expressly aimed its tortious conduct at the forum and plaintiff's forum state was the focus of the activities of the defendant out of which the suit arises. *See, e.g.*, *Reynolds*, 23 F.3d at 1110; *Koch v. Local 438, United Autoworkers Union*, No. 00-6200, 2002 WL 31873481, at **3-5 (6th Cir. Feb. 12, 2002);

7

release by the defendant athletic federation, an unincorporated association, based in London, England. *Id.* at 1112. The press release announced that it was suspending the plaintiff, a world-class professional athlete, from competing in international track meets for two years because he had tested positive for steroid use at a track meet in Monaco. *Id.* The plaintiff, an Ohio resident, brought claims in Ohio against the athletic organization for breach of contract, defamation, and intentional interference with business relations. *Id.* We held that the defendant's contacts were insufficient to create personal jurisdiction over the defendant, distinguishing the facts from those of *Calder* because the press release concerned activities in Monaco, not Ohio; the release was based on a drug sample taken in Monaco, not Ohio; the defendant did not publish or circulate the report in Ohio; Ohio was not the focal point of the press release; and the plaintiff's professional reputation was not centered in Ohio. *Id.* at 1120. We also pointed out that, although Reynolds lost Ohio corporate endorsement contracts and appearance fees in Ohio, there was no evidence that the athletic federation knew of the contracts or their Ohio origin. *Id.*

The actions of Defendants in this case are more akin to those of the defendant in *Calder* than those of the defendant in *Reynolds*. Most importantly, like *Calder* and unlike *Reynolds*, both Defendants knew of the connection between the Master Contract and the forum state, Ohio, and

---

*see also Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1079-80 (10th Cir. 1995) (stating that *Calder* did not set forth a per se rule that the allegation of an intentional business tort alone is sufficient to confer personal jurisdiction in the forum where the plaintiff resides, and analyzing instead the terms of the contract, the parties' course of dealing, and the contacts created by the out-of-state-defendant in committing the alleged tort); *Southmark Corp. v. Life Investors Inc.*, 851 F.2d 763, 772-73 (5th Cir. 1988) (stating that contractual relations of a company in the forum state was not necessarily equivalent to "expressly aiming" tortious conduct at the forum, and thus, would not meet due process requirements); *Imo Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 264 (3d Cir. 1998) (determining that *Calder* was not satisfied simply because the injury occurred in the forum state and refusing to conclude that the defendant expressly aimed its tortious activity at the forum state since the defendant did not know that a corporation of the forum state could be the victim of its conduct).

further knew that the Master Contract was not merely an isolated transaction, but rather, one that contemplated the possibility of future assets purchases and that sought to limit competition with Scotts in the lawn care business. Defendants also knew Scotts had a contractual right to purchase TechPac from their affiliate and allegedly intentionally interfered with Scotts' exercise of that right first by failing to inform Scotts of the TechPac purchase, and then later allegedly making a sham offer. Finally, Defendants knew that the brunt of the harm would be felt in Ohio, where Scotts conducts business.

Thus, under the effects test of *Calder*, the focal point of the damage was Ohio, and Defendants were unquestionably aware of the potential damage to Scotts, based on the terms of the Master Contract. *See Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 910 (6th Cir. 1988) (stating that "prior negotiations, contemplated future consequences, the terms of the contract, and the actual course of dealings need be addressed to evaluate, in a 'highly realistic' way, the intended future consequences that are the real object of the business transaction"). In short, Scotts has demonstrated facts sufficient to support a finding that both Aventis and StarLink purposefully directed activities at a resident of Ohio that caused consequences in the forum state and that they therefore should have reasonably foreseen that they could be haled into an Ohio court as a result.

Under the second *Southern Machine* factor, the cause of action must arise out of Defendants' activities in the forum. *Southern Mach.*, 401 F.2d at 381. A cause of action can be of whatever type, as long as it has "a substantial connection with the defendant's in-state activities." *Id.* at 384 n.27. "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract." *Id.* at 384 n.29 (citations omitted). We have also stated that a "lenient standard . . . applies when evaluating

9

the 'arising from' criterion." *Bird*, 289 F.3d at 875.

Under the "made possible test" of *In-Flight Devices*, personal jurisdiction can be exercised where both acts of breach of contract and tortious misconduct and their consequences are made possible only by the defendant's transaction of business with the plaintiff. *In-Flight*, 466 F.2d at 231. Here, Defendants' conduct in acquiring a controlling interest in TechPac and transferring that interest to Starlink was tortious because of the Master Contract, which was negotiated and executed in Ohio, and which was intended to limit competition with an Ohio-based company. Defendants knew that their predecessors executed the contract in Ohio, Scotts' principal place of business. In short, but for the Master Contract and its option-to-purchase clause, there would have been no alleged tortious interference. Therefore, under the second *Southern Machine* factor, we find that Scotts' claims against Aventis and StarLink arose from their predecessors' specific business contacts with Ohio.

We also find that the final *Southern Machine* requirement is satisfied. This Court has stated that when the first two factors are met, a presumption arises that the exercise of jurisdiction would be "reasonable" under the third factor. *See Third Nat'l Bank v. WEDGE Group Inc.*, 882 F.2d 1087, 1092 (6th Cir. 1989). Further, it cannot be disputed that Ohio has an interest in resolving a suit brought by one of its residents against Defendants that purposefully availed themselves of acting in and causing consequences in Ohio. *See id.*

In sum, Scotts has made a prima facie showing that the exercise of specific jurisdiction over Aventis and StarLink would not offend traditional notions of fair play and substantial justice. Accordingly, when we draw all permissible inferences in favor of Scotts at this stage of the proceedings, we hold that the district court erred in holding that the exercise of specific jurisdiction

10

would not satisfy due process standards. Accordingly, Defendants may be haled into an Ohio court to answer Scotts' claims that they tortiously interfered with its contractual rights. Given the conclusion that the exercise of specific jurisdiction is proper, we need not address Scotts' argument regarding general jurisdiction.

## IV.

For the foregoing reasons, we **REVERSE** the district court's order dismissing this diversity action for lack of subject matter jurisdiction and **REMAND** to the district court for further proceedings.